Ike C. MALLARD, Plaintiff,

v.

W. Graham CLAYTOR, Jr., Defendant.

Civ. A. No. 76–1340.

United States District Court,
District of Columbia.

Jan. 31, 1978.

June D. W. Kalijarvi, Washington, D. C., for plaintiff.

Stephen S. Cowen, Asst. U. S. Atty., Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Charles R. RICHEY, District Judge.

The above-entitled cause came on for trial before the Court, sitting without a jury, pursuant to Title VII of the Civil Rights Act of 1964, as amended, by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–16, which gave federal employees in executive agencies and other named agencies and departments a cause of action for discrimination in all personnel actions affecting such employees on account of race, color, religion, sex, or national origin. The Act also gave federal employees a cause of action for retaliatory action by employers because of the employees' active opposition to defendant's unlawful employment practices.

The plaintiff presented his entire case in chief on January 23–24, 1978. The defendant did *not* move to dismiss, pursuant to Fed.R.Civ.P. 41(b), admitting at closing argument that the plaintiff had proved a *prima facie* case of discrimination. Both parties having stipulated before trial to admit the entire administrative record into evidence, the trial was concluded on January 26, 1978. Upon consideration thereof, and the testimony and exhibits received in evidence, including the arguments of counsel for the parties, the Court, this 31st day of January, 1978, makes the following findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

### I. THE PARTIES

A. *Plaintiff*

1. Plaintiff Ike C. Mallard is a 48 year old, black male, residing at 1213 Emerson Street N.E., Washington, D. C. 20017.

2. Plaintiff entered on duty (by means of a lateral transfer) at the Naval Weapons Engineering Support Activity (NAV-WESA) on August 22, 1970, as a Physical Science Technician, GS-8.

3. Plaintiff was promoted on November 1, 1970, to GS-802-9, Engineering Technician, in the Physical Standards Branch (Section 54–Optics), Eastern Standards Laboratory (ESA-52), Metrology Department (ESA-5), NAVWESA.

4. On September 16, 1973, plaintiff was promoted to GS-802-11, Engineering Technician, in the Physical Standards Branch (Section 54), Eastern Standards Laboratory (ESA-53), Metrology Department (ESA-5), NAVWESA.

5. Plaintiff was promoted to Senior Engineering Technician GS-802-12 on February 13, 1977.

6. Plaintiff has received satisfactory ratings for his performance each year since 1970.

7. Plaintiff has been responsible for calibrating all types of optical instruments since 1970.

8. Plaintiff was appointed to the NAVWESA Equal Employment Opportunity (EEO) Committee prior to 1975.

9. Plaintiff acted as Chairman of the NAVWESA EEO Committee prior to 1975.

10. Plaintiff was appointed an Equal Employment Opportunity Counsellor on June 28, 1975.

B. *Defendant*

1. The defendant agency is the United States Department of the Navy. The specific organizational units involved are the Naval Weapons Engineering Support Activity (NAVWESA), and NAVWESA's subunits, the Metrology Department (ESA-5), Eastern Standards Laboratory (ESA-53), and the Physical Standards Branch.

2. At all times relevant to this complaint plaintiff was supervised by Jack Fath (white male) GS-830-13, head Physical Standards Branch; William J. Johnson (white male) Supervisory Engineering Technician GS-12; David B. Spangenberg (white male), Supervisory Mechanical Engineer, GS-802-14; and head of the Eastern Standards Laboratory Division (ESA-53); Joseph P. Fincutter (white male), GS-830-15, head Metrology Department ESA-5; and James C. Paxton, GS-801-15, Technical Director, NAVWESA. At all times relevant to this complaint, plaintiff knew and/or worked with Earl Morris (white male) Supervisory Engineering Technician GS-12.

## II. EMPLOYMENT STRUCTURE AT NAVWESA

1. As of the date defendant agency requested a GS-802-12, Senior Technician, position be created, in the Physical Standards Branch, Eastern Standards Laboratory (ESA-53), Metrology Department (ESA-5) NAVWESA (February 21, 1975), minority males were "obviously underrepresented" in NAVWESA, as defined by internal Department of Navy regulations. On April 3, 1975, the NAVWESA Equal Employment Opportunity Policy and Program Report stated:

*SUMMARY OF ASSESSMENTS OF THE EEO SITUATION*

. . . The first area of concern is the apparent lack of minority men within the present overall work force (total 28, or 4.6%) which is definitely not commensurate with their population in the recruitment area.

This same report states that of 55 GS-802 engineering technicians only 5 (9%) are black. It further required that because of underrepresentation of minorities (and women) in grades GS-9-15 in NAVWESA every effort will be made to increase minorities in grades 9-12.

2. On August 30, 1975, the date this complaint arose at the administrative level NAVWESA, ESA-5 and ESA-53 employed the minority personnel as displayed on Chart 1.

3. In 1974 and 1975 blacks in NAVWESA received 4.2% and 1.6% respectively of all promotions at the GS-9 level and above:

18

CHART I

NAVWESA MINORITY EMPLOYMENT PROFILE (GS–9 & ABOVE) AS OF 8/30/75

| | NAVWESA | | ESA–5 (METROLOGY DEPT.) | | ESA—EASTERN STANDARDS LAB. DIVISION | | ESA—PHYSICAL STANDARD BRANCH | |
|---|---|---|---|---|---|---|---|---|
| | WHITE | MINORITY | WHITE | MINORITY | WHITE | MINORITY | WHITE | MINORITY |
| 9–10 | 42 ( 84%) | 8 (16%) | 1 ( 50%) | 1 (50%) | | 1 (100%) | 1 * ( 50%) | 1 * (50%) |
| 11 | 92 ( 91%) | 9 ( 9%) | 17 ( 85%) | 3 (15%) | 12 ( 80%) | 3 ( 20%) | 5 * ( 71%) | 2 (29%) |
| 12 | 151 ( 94%) | 9 ( 6%) | 17 ( 94%) | 1 ( 6%) | 5 ( 83%) | 1 ** ( 17%) | 1 * (100%) | |
| 13 | 194 ( 94%) | 12 ( 6%) | 3 ( 75%) | 1 (25%) | 2 (100%) | | | |
| 14 | 67 ( 97%) | 2 ( 3%) | 3 (100%) | | 1 (100%) | | 1 * (100%) | |
| 15 | 25 (100%) | | 1 (100%) | | | | | |
| 16 | 1 (100%) | | | | | | | |
| TOTALS | 577 ( 92%) | 40 ( 8%) *** | 42 ( 87%) | 6 (13%) | 20 ( 80%) | 5 ( 20%) | 8 * ( 73%) | 3 * (27%) |

\* Promoted to GS–11 on or about 8/30/76 GS–11 profile post 8/30/75; White—6 (67%); Black—3 (33%)
\*\* Johnnie Darden promoted 8/30/75. Position Vacancy Announcement No. 1071.
\*\*\* 31 Blacks; 3 Spanish; 2 Indians; 4 Orientals.

SUMMARY PROMOTIONS GS–9 AND ABOVE
1974/75 IN NAVWESA

| GS | 1974 | WH | % | BL | % | 1975 | WH | % | BL | % |
|---|---|---|---|---|---|---|---|---|---|---|
| 9/10 to 11 | | 23 | (95.8) | 1 | (4.2) | | 27 | (100) | 0 | |
| 11 to 12 | | 23 | (92.0) | 2 | (8.0) | | 25 | (96.2) | 1 | (3.8) |
| 12 to 13 | | 17 | (100) | 0 | | | 2 | (100) | 0 | |
| 13 to 14 | | 5 | (100) | 0 | | | 3 | (100) | 0 | |
| | | 68 | (95.8) | 3 | (4.2) | | 57 | (98.4) | 1 | (1.6) |

4. As of August 30, 1975, there were 90 supervisory level employees in NAVWESA, of whom 88 or 98% were white and 2 (2%) were black.

5. As of August 30, 1975, there were no black supervisors in either the Metrology Department or the Eastern Standards Laboratory Division.

6. As of August 30, 1975, there was only one black GS–12 senior engineering technician in the Metrology Department and the Eastern Standards Laboratory Division, and no black GS–12 senior engineering technician in the Physical Standards Branch.

7. As of July 19, 1976, NAVWESA had the following employment profile:

NAVWESA STAFFING ANALYSIS

| | White | | Minority | |
|---|---|---|---|---|
| GS 9/10 | 38 | (81%) | 9 | (19%) |
| GS–11 | 88 | (90%) | 9 | (10%) |

NAVWESA STAFFING ANALYSIS

| | White | | Minority | |
|---|---|---|---|---|
| GS–12 | 140 | (95%) | 8 | ( 5%) |
| GS–13 | 114 | (95%) | 7 | ( 5%) |
| GS–14 | 39 | (100%) | – | |
| GS–15 | 13 | (100%) | – | |

8. The average grade of white and black employees decreased between December 31, 1974, and July 19, 1976:

| AVG. GRADES | WHITE | BLACK |
|---|---|---|
| Dec. 31, 1974 | 12.2 | 8.1 |
| Aug. 30, 1975 | 11.0 | 7.7 |
| April 7, 1976 | 10.7 | 7.3 |

9. White employees of NAVWESA, ESA–5 and ESA–53 received the majority of promotions above GS–11 from January 1974 to date.

10. The Court finds the statistics introduced by the defendant unpersuasive. The Census Report compiled in 1969 is not strong evidence of the situation in 1975,

when the facts in the complaint arose. Furthermore, the statistics introduced only reflect the male population, while no sex discrimination is alleged here. Moreover, the statistics that the defendant relies on for grade level breakdowns is GS–11, while the plaintiff's main allegation alleges discrimination against him in not being promoted to GS–12.

## III. NONSELECTION OF PLAINTIFF FOR VACANCY ANNOUNCEMENT NO. 32–74 (75) GS–802–12 SENIOR ENGINEERING TECHNICIAN (POSITION DESCRIPTION 1072)

1. On February 21, 1975, Mr. Fincutter, head of Metrology Department and Mr. Paxton, Technical Director NAVWESA submitted a request for Personnel Action (SF–52) to create and advertise for competitive selection a new position entitled Senior Engineering Technician, GS–802–12. The position required that the selectee have primary responsibility for at least three (3) of 18 technical areas for which the Physical Standards Branch is responsible.

2. The purposes in creating a new GS–12 position in the branch and of requiring that the successful selectee be expert in at least three technical areas as defined by the Technical Director were:

 a) to create a position at a level of responsibility and grade level that is commensurate with the substantive work being done by the engineering technicians; and

 b) to allow all qualified GS–11 engineering technicians to be eligible for promotion.

3. In April 1975, NAVWESA personnel requested Mr. Spangenberg to select some specific technical areas for which the incumbent of the new position would be responsible. Although the position description sought experience in at least 3 of 18 technical areas, NAVWESA personnel did not *require three specific areas,* only that the areas selected be of sufficient complexity to warrant classification at the GS–12 level.

4. Mr. Spangenberg selected the technical areas of *acoustics, vibration* and *flow* as the specific areas in which the incumbent must have expertise. Mr. Spangenberg claims to have based his selection of these three areas on two criteria: a) the overall workload in the branch, and b) the capability to "semi-automate" the technical areas.

5. The workload in acoustics, vibration and flow did not differ significantly from the workload in the area of optical physics. The area of optical physics can be semi-automated and is now being semi-automated. Semi-automation would reduce the standards overdue by approximately 30–35%.

6. The selectee for position description 1072 is a white male, Mr. Walter Kehres.

7. The selectee was at the time of his selection only responsible for the area of acoustics, specifically calibration of microphones.

8. Plaintiff was, at the time the selection was made for P.D. 1072, primarily responsible for and possessed expertise in three of the technical areas listed on the original position description, namely, geometrical optics, dimensional physics, and length, as well as having knowledge of density and temperature.

9. Mr. Spangenberg's selection of the technical areas of acoustics, vibration and flow virtually precluded plaintiff from qualifying for the position described in P.D. 1072.

10. Mr. Kehres, the selectee, was not an expert in the technical area of flow.

11. Mr. Kehres, the selectee, stated on his application for P.D. 1072 that he was a senior engineering technician in the Vibratory Mechanics area, and that he served as a primary assistant and sole consultant in the areas of flow, pressure/vacuum, optics, mass, temperature, force, length standards, hygometry, torque, and hydrometry.

12. Mr. Kehres' selection was based on his Application (SF 171) and his supervisory appraisal, which cannot be found.

13. Mr. Kehres did not serve in some of the specific capacities outlined in his application.

14. Plaintiff received a promotion to GS–802–12 Senior Engineering Technician on or about February 20, 1977.

15. Mr. Kehres was and is designated acting supervisor in the absence of the branch chief.

## IV. NON–PROMOTION OF PLAINTIFF BECAUSE OF HIS EEO ACTIVITIES

1. Plaintiff was informed by Earl Morris that Joseph Fincutter, a supervisor, had told him that plaintiff would not be promoted because of his activities on behalf of equal employment opportunity at NAVWESA. The Court finds Earl Morris to be a credible witness, based on his demeanor and the fact that two of the defendant's witnesses attested to his veracity.

2. Plaintiff was informed by James C. Paxton, the NAVWESA Technical Director, that his chances for promotion were "slim" because of involvement in EEO.

3. Plaintiff was informed by Mr. Spangenberg that he spent "too much time on EEO."

4. Plaintiff's time sheets reveal that he spent approximately 10 minutes per official work day on EEO Matters between September 1974 and October 1976. Plaintiff normally performed his EEO duties after NAVWESA working hours, and during luncheon breaks.

5. Plaintiff was also treated differently, in a disrespectful manner after he became Chairman of the NAVWESA EEO Committee. Prior to his appointment he was referred to as "Ike" or "Mr. Mallard" but after as "that damn skinny nigger,".

## V. SELECTION OF WILLIAM KEHRES AS HIGHEST QUALIFIED

1. By letter dated June 12, 1975, Mr. Spangenberg was appointed Chairman of the Evaluation Board to review, evaluate, and make recommendations of the best qualified candidates to fill the position of Senior Engineering Technician, GS–802–12, P.D. 1072. In addition to Mr. Spangenberg, Messers. Joseph Lattin (white), William J. Johnson (white), and Robert Goings (black) were appointed as members of the Board.

2. The members of the selection panel met and were instructed as to their duties and responsibilities by Mr. Tucker and Mr. Chromy. They then ranked each of the qualified applicants separately.

3. In rating the applicants for the subject vacancy, the members of the panel appear to have followed applicable Civil Service, Navy, and Command regulations and instructions.

4. In rating and ranking the applicants for the subject position, the level and type of education received by the applicants was considered by the panel members only to the extent that it related to the factors set forth on the ranking sheets.

5. To obtain a rating of best, or highly qualified, for the subject vacancy, an applicant had to obtain an average score of 57 from the four raters. Plaintiff received an average score of 36.4, lowest among those rated for the position, while the selectee, Mr. William Kehres, received a score of 58, the highest score received. Mr. Kehres was the only candidate ranked "highly qualified" for the subject vacancy.

6. Even if the plaintiff hypothetically had been given a perfect score in the technical requirements of items 5 and 6 (which are the items that relate to the selection of acoustics, vibration and flow as requirements) on the evaluation sheet, he still would not have scored enough points to be in the highly qualified category. The reason for this result is that the plaintiff scored lower than Mr. Kehres in non-technical areas also.

7. Neither plaintiff's race nor his prior EEO activity played any role in the rating and ranking of his application on the first four non-technical items for the subject vacancy.

8. The Evaluation Board forwarded the Merit Promotion Certificate to Mr. James C. Paxton, the selecting official. The certificate listed Mr. Kehres as the only candidate highly qualified for the subject position.

9. Mr. Paxton, as was his usual practice, followed the recommendation of the Evaluation Board and selected Mr. Kehres for the subject vacancy.

10. Earl Morris, a witness for the plaintiff whom this Court has already stated is a highly credible witness, testified that Mr. Kehres was "the best technician in the Lab" and "would have been selected for the GS–12 job [the plaintiff] wanted regardless."

11. The individual selected to fill the subject vacancy, Mr. Kehres, a white male, was the best qualified applicant for the position and would have been selected even if the discrimination in the selection of the technical areas had not occurred.

## CONCLUSIONS OF LAW

This action was brought under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972 (42 U.S.C. §§ 2000e et seq.) alleging discrimination in the employment practices and personnel actions of the defendant. The specific personnel action complained of here is defendant's failure to promote plaintiff to the position of GS–802–12, Senior Engineering Technician, in August 1975. Plaintiff also complains of defendant's systemic and continuing policy of racial discrimination in terms and conditions of employment, including promotions above GS–11 in general and defendant's failure to promote plaintiff in particular, and training, travel, interference and failure to comply with the defendant's Equal Employment Opportunity Program.

After being notified that he was not selected for promotion to GS–802–12 Senior Engineering Technician and that a white employee had been selected, plaintiff filed a timely administrative complaint of discrimination with defendant—pursuant to 5 C.F.R. 713. Defendant accepted almost all allegations of plaintiff's complaint. Plaintiff timely appealed that rejection to the Civil Service Commission's Appeals Review Board. Plaintiff timely filed this complaint in U.S. District Court more than one hundred and eighty days after filing his administrative complaint. 42 U.S.C. §§ 2000e et seq.

The Supreme Court in McDonnell-Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), enumerated the standard for establishing a prima facie case of racial discrimination. Plaintiff's initial burden under Title VII is to show by a preponderance of the evidence:

(i) that he belongs to a racial minority;

(ii) that he applied for and was qualified for a job for which the employer was seeking applicants;

(iii) that despite his qualifications, he was rejected; and

(iv) that after his rejection the employer continued to seek applicants from persons of plaintiff's qualifications.

Once the plaintiff establishes the general elements of a prima facie case, the burden then shifts to the employer to prove by a preponderance of the evidence "some legitimate, non-discriminatory reason" for plaintiff's rejection. Id. If the defendant meets this burden, the plaintiff may rebut by demonstrating that defendant's stated reason for rejection was in fact pretext.

The Court finds, and the defendant admits, that the plaintiff has proved a prima facie case. In the instant case, the statistical evidence concerning black employees at the GS–11 and above, the statistical evidence concerning promotions of blacks above GS–11, and the defendant's official recognition in the NAVWESA Affirmative Action Plan that blacks are underrepresented from the GS–9 to GS–15 grade levels, demonstrate that defendant's employment practices in general and, specifically, regarding promotion of blacks to GS–12 and above had at the time this complaint arose an adverse impact on black employees at NAVWESA, the Metrology Department, and the Eastern Standards Laboratory.

In addition, the Court finds that the plaintiff has met his burden in establishing the four elements of the McDonnell-Douglas test. Therefore, the burden shifts to the defendant to rebut this prima facie case.

The defendant argues that the requirement and actual selection of the three tech-

nical areas were rational and based on the legitimate business concerns of the laboratory. The "business necessity" justification for employment practices was well recognized by the Supreme Court in *Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Delineating the remedial purposes of Title VII, the Court said:

> [Title VII] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is *business necessity.* If an employment practice which operates to exclude Negroes [sic] cannot be shown to be related to job performance, the practice is excluded. (Emphasis added)

401 U.S. at 431, 91 S.Ct. at 853. The defendant asserts that, "the selection of the areas of acoustics, vibration and flow would, given the automatic data processing at hand at the time and the instrumentation associated with the measurement areas, have provided the greatest degree of benefit to the division in the shortest possible time."

The Court finds that the defendant's decision to select three specific technical areas was arbitrary and based solely on the subjective decision of Mr. Spangenberg. There was no reason that three areas had to be selected because, in doing so, as Mr. Paxton admitted, "you are almost pre-selecting a person." These specific areas were supposedly chosen because of the ease in automating them and because of the heavy workloads in each. However, the Court finds that two of the areas have not been substantially automated. Furthermore, the workload in optics (the plaintiff's area), which was not selected as a technical area, was heavier, because of the length of time needed to calibrate standards, than the workload in flow, which was selected. In addition, the defendant has admitted that the person selected was not an expert in the area of flow, thus suggesting the arbitrariness and lack of business necessity in the selection of the three specific criteria.

Even if the defendant had met his burden of proving that the criteria used served a "business need," the plaintiff here has shown that the criteria used was selected as a mere "pretext" for discrimination. *See Albemarle Paper Company v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). Upon consideration of all the evidence, the Court finds that the three criteria were selected so as to exclude the plaintiff from the position of GS–12 because of his EEO activities. Mr. Morris testified that the selection of these criteria eliminated the plaintiff as a candidate for the position. Mr. Tucker admitted that this selection gave Mr. Kehres, the selectee, a technical advantage over the other candidates. Furthermore, the statements made by Mr. Fincutter, Mr. Paxton, and Mr. Spangenberg (who actually selected the three criteria) indicate a clear intent on their part to retaliate against the plaintiff because of his EEO activities. Accordingly, the Court is convinced that the selection of the three criteria was a mere "pretext" to deny the plaintiff the promotion because of his opposition to the defendant's unlawful employment practices, in violation of § 704(a) of Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. § 2000e–3(a).

Nevertheless, the Court finds that the plaintiff is not entitled to back pay or retroactive promotion because the defendant has met its burden of establishing by clear and convincing evidence that, *had there been no discrimination against the plaintiff in the selection of the three criteria, the plaintiff would not have been selected for the position. See Day v. Mathews,* 174 U.S.App. D.C. 231, 530 F.2d 1083 (1976).[1] As defendant's exhibits 6 and 7 point out, there were

---

1. The Court wishes to note that the "but for" rule of *Day v. Mathews,* 174 U.S.App.D.C. 231, 530 F.2d 1083 (1976) is consistent with the intent of the Supreme Court in characterizing Title VII as a "make whole" statute. *See Franks v. Bowman Transportation Company,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). If this plaintiff were to be awarded back pay or a retroactive promotion, then he would be made "greater than whole" in that the violation of Title VII was not the cause of the alleged loss of back pay and promotion.

six factors used to rate the candidates for the GS–12 position. Only the last two factors are directly related to the three specific areas which were selected to preclude the plaintiff from getting the job. The Court finds that the first four factors are facially neutral and that these were not discriminatorily applied. Consequently, the Court finds that plaintiff would not have been chosen for the position *even if there had been no discrimination,* because allocating the highest point value to the plaintiff for the factors influenced by the discrimination does not even place the plaintiff in the highly qualified range that the selectee, Mr. Kehres, had achieved. Accordingly, the Court cannot award back pay or retroactive promotion to the plaintiff because the "but for" test has not been satisfied.