Carolee Brady HARTMAN, et
al., Plaintiffs,

v.

Charles Z. WICK, Defendant.

Civ. A. No. 77–2019.

United States District Court,
District of Columbia.

Nov. 16, 1984.

Bruce A. Fredrickson, Webster & Fredrickson, Susan L. Brackshaw, Webster & Fredrickson, Washington, D.C., on brief, for plaintiffs.

Robert E.L. Eaton, Asst. U.S. Atty., Joseph E. diGenova, U.S. Atty., Judith A. Futch, Richard H. Swan, Assts. Gen. Counsel, U.S. Information Agency, Washington, D.C., on brief, for defendant.

CHARLES R. RICHEY, District Judge.

## INTRODUCTION

This case is before the Court on remand by the Court of Appeals. Although the Court of Appeals affirmed this Court's decision as to the individual discrimination claim of Luba De Medina and a class claim of discrimination in the promotion of women, it remanded the case as to (1) a class claim of discrimination in hiring, (2) a class claim of retaliation for participation in protected activities, and (3) the individual claim of Rose Kobylinski. For the background of this protracted litigation, *see De Medina v. Reinhardt,* 686 F.2d 997, 1000–01 (D.C. Cir.1982). With the express agreement of the parties, the Court has considered these

claims on the existing trial record, post-remand briefs, supplemental memoranda, and oral argument. After careful consideration, the Court has decided that it must deny the class claim of retaliation, but it will grant relief on the class claim of discrimination in hiring, and on the individual claim of Rose Kobylinski. This Opinion shall constitute the Court's findings of fact and conclusions of law on these claims.

## THE COURT FINDS THAT ROSE KOBYLINSKI WAS DISCRIMINATED AGAINST ON THE BASIS OF HER SEX

Following trial, this Court denied jurisdiction over Rose Kobylinski's claim on the ground that she had failed to file a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and had thus failed to exhaust her administrative remedies as required by 42 U.S.C. § 2000e–16. The Circuit Court reversed this Court's dismissal, noting that since the trial, "the Supreme Court has decided that the requirement of timely filing is akin to a statute of limitations and is not a jurisdictional prerequisite ...." *De Medina v. Reinhardt*, 686 F.2d at 1012 (citing *Zipes v. Trans World Airlines*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982)). The Circuit Court found the Kobylinski complaint so similar to the complaint filed by Josefina Martinez, an intevenor with Ms. Kobylinski, " 'that it can fairly be said that no conciliatory purpose would be served by filing separate EEOC charges.' " *Id.* (quoting *Foster v. Gueory*, 655 F.2d 1319, 1322 (D.C.Cir.1981)). Thus, the Court will reach the merits of Ms. Kobylinski's claim.

Ms. Rose Kobylinski, a female naturalized citizen of the United States born in Poland, began working in 1964 as a foreign language broadcaster in the Polish Service of the Voice of America, a component of the United States Information Agency ("Agency"). In June, 1977, the Agency posted a vacancy announcement for a GS–12 writer-editor (radio) position in the Polish Service. At that time Ms. Kobylinski was a GS–11. She held a Bachelor of Arts

degree and was experienced in radio broadcasting, as well as writing and journalism. The job description in the vacancy announcement stated that the job included writing weekly features on American Space and other scientific achievements. At that time, there was one Polish Service employee, a male, who occasionally wrote features on American space and other scientific achievements. Ms. Kobylinski complained to the personnel office that the Agency had preselected the male candidate, whom she named, to fill the GS–12 vacancy. Subsequently, the vacancy announcement was withdrawn, and the reposted announcement made no reference to writing features on American space and other scientific achievements. Nevertheless, the male who Ms. Kobylinski had asserted had been preselected for the position was selected to fill it. Ms. Kobylinski did not apply for it because, as she informed officials of the Agency, she felt it would be futile in light of the Agency's preselection.

Ms. Kobylinski's claim is one of disparate treatment. She alleges that the Agency violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–16, by discriminating against her on the basis of sex with regard to job promotions. The gravamen of her complaint is that the Agency preselected a male candidate to fill the vacant position. If proven, such preselection, in the form of "tailoring" job qualifications to those of a particular candidate, violates Title VII. *E.g. Coble v. Hot Springs School District No. 6*, 682 F.2d 721, 728 (8th Cir.1982); *Mallard v. Claytor*, 471 F.Supp. 16, 22 (D.D.C.1978).

## MS. KOBYLINSKI HAS ESTABLISHED A PRIMA FACIE CASE

■ In order to prevail on a disparate treatment claim, the plaintiff first "has the burden of proving by a preponderance of the evidence a prima facie case of discrimination." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). A plaintiff establishes a prima facie case by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which an employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Of course, "[t]he facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required ... is not necessarily applicable in every respect in differing factual situations." *Id.* at 802, n. 13, 93 S.Ct. at 1824, n. 13.

■ Here the record is clear that Ms. Kobylinski did not apply for the job which she alleges was discriminatorily tailored for male candidates. The Supreme Court has held that a non-applicant may prevail in a disparate treatment case if she meets "the not always easy burden of proving that [she] would have applied for the job had it not been for those [discriminatory] practices." *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 367–68, 97 S.Ct. 1843, 1870–71, 52 L.Ed.2d 396 (1977). In Ms. Kobylinski's case, the Court finds that the Agency had, in fact, preselected a male candidate to fill the GS–12 writer-editor (radio) position in the Polish Service. Ms. Kobylinski's application, therefore, would have been an exercise in futility, despite her qualifications. For this reason, and because the allegedly "targeted" male actually filled the vacant position, Ms. Kobylinski has established her *prima facie* case.

## THE AGENCY CANNOT REBUT MS. KOBYLINSKI'S PRIMA FACIE CASE

■ Once the plaintiff establishes a *prima facie* case, the defendant may rebut by producing evidence that someone was preferred over the plaintiff for a legitimate, nondiscriminatory reason. *Texas Dept. of Community Affairs*, 450 U.S. at 254, 101 S.Ct. at 1094. The defendant need only raise a genuine issue of fact as to whether it discriminated against the plaintiff. *Id.* at 254–55, 101 S.Ct. at 1094–95. Here the Agency asserts three arguments in rebuttal. All three arguments must fail.

■ The Agency claims that because Ms. Kobylinski had not applied for the GS–12 position, it had no way to ascertain her interest in the position. This assertion is flatly contradicted by the evidence. It was Ms. Kobylinski who complained to the Agency's personnel office about the "tailored" nature of the vacancy announcement. In light of her complaint and her qualifications, the Agency will not be heard to claim that it did not know about Ms. Kobylinski's interest in the job.

■ The Agency also asserts that the "tailored" notice was inadvertent. Once Ms. Kobylinski alerted the Agency to the error, the Agency removed the announcement, and then posted one without the "tailored" qualifications. The response to this assertion is two-fold. First, it is the *preselection* that is discriminatory, not the written content of the vacancy notice. Although the Agency claims that the qualifications for the position did not include writing features on American space and scientific achievements, even after the posting of the neutral vacancy announcement, the originally targeted male candidate was selected to fill the vacancy. Furthermore, the claim of inadvertence is doubtful. This was not the only "preselected" vacancy announcement—it happened on at least two other occasions. In October, 1979, a vacancy occurred in the Polish Service for a GS–12 writer position. The posted vacancy announcement required experience in writing scripts on economics and other specialized topics. At that time there was only one Polish Service employee with this type of background, and he received the job. Another Polish Service vacancy occurred in 1980, and the announcement required experience in teaching English lessons on international radio. Only one employee, a male, had such experience, and he was selected to fill the position. Because of these other instances of preselection, the Court finds

that the Agency's preselection in this case was not inadvertent.

■ The Agency also contends that the rejection of Ms. Kobylinski was not discriminatory because the position was filled pursuant to its standard personnel procedures. The applications were initially screened by the personnel office, which referred a list of "best qualified" applications to the selecting official. The selecting official then made the final choice, choosing the male candidate from the "best qualified" group. The Agency contends that this procedure protects against preselection. Again, the flaw in the Agency's reasoning is obvious. The personnel office knew about Ms. Kobylinski's interest in the position, but she was never considered because she did not file an application. As stated above, such an application would have been futile. The whole procedure, therefore, was not neutral, as the Agency suggests, but tainted by the preselection. Moreover, a 1976 Civil Service Commission review of the Agency's personnel actions found that the "promotion actions for competitive service have not met the standards of the Federal Merit Promotion Policy." In particular, the Commission concluded that, in some cases, there was evidence "which support[s] that there was preselection and favoritism exhibited in competitive actions." Clearly the Agency cannot rebut the plaintiff's *prima facie* case by following its standard procedures.

### EVEN ASSUMING THAT THE AGENCY REBUTTED MS. KOBYLINSKI'S PRIMA FACIE CASE, THE AGENCY'S STATED REASONS ARE PRETEXTUAL

■ Even if the defendant successfully rebuts the plaintiff's *prima facie* case, the plaintiff may still show that the defendant's stated reasons for the plaintiff's rejection are mere pretext. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. The pretext is clear in the present record.

As noted above, the Agency preselected male candidates on at least three occasions. The Civil Service Commission also concluded that the Agency's promotion procedures had not met the appropriate standards. Therefore, even assuming that the Agency successfully rebutted Ms. Kobylinski's *prima facie* case, Ms. Kobylinski must prevail because the Agency's justifications are a mere pretext for discrimination.

### THE COURT FINDS THAT THE AGENCY DID NOT RETALIATE AGAINST THE CLASS

By Order of April 19, 1978, this Court conditionally certified this case as a class action. The conditionally certified class consisted of "all women who have applied for employment with or are currently employed by the United States Information Agency and who have been or continue to be adversely affected by the discriminatory employment practices of the defendant." [1] At that time, the only discriminatory practices at issue concerned "promotion and hiring practices." Original Complaint ¶ 1. However, by Order of October 10, 1978, the Court granted plaintiffs leave to file an amended supplemental complaint. That complaint, as amended, included a claim that the Agency "maintained a practice of reprisals against women who have filed sex discrimination charges against the Agency." Supplemental Complaint ¶ 2. Thus, the action contains a class claim against the Agency based on its allegedly discriminatory retaliation. Although this Court denied the class claims, including the retaliation claim, by its October 24, 1979, Findings of Fact and Conclusions of Law, it did not make any findings regarding the class retaliation claim. In remanding the case, the Court of Appeals directed this Court to make findings of fact and conclusions of law concerning this claim. The Court now considers that claim.

The class retaliation claim is brought under Section 704(a) of the Civil Rights Act of

---

**1.** The Court, by Order of October 24, 1979, amended the class to exclude women employees in clerical positions.

1964, 42 U.S.C. § 2000e–3(a). That section provides, in pertinent part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

42 U.S.C. § 2000e–3(a).

██ This section protects those plaintiffs who filed EEO charges against the defendant, or who otherwise "participated" in such a proceeding. It is also clear that the "opposition" clause of this section protects those plaintiffs whose opposition to the defendant's practice fell short of actually filing EEO charges. *Parker v. Baltimore and Ohio Railroad*, 652 F.2d 1012, 1019 (D.C.Cir.1981). However, because of the language of the Supplemental Complaint, which limited the retaliation claim to "women who have filed sex discrimination charges", the defendant seeks to preclude the Court from considering reprisals against women who did not file charges against the Agency. The Court rejects this contention because, ever since April, 1979, when the plaintiffs sought to enjoin the Agency from retaliating against individuals who opposed the Agency's actions or who "otherwise exercise[d] their rights under Title VII", the Agency has had sufficient notice that the plaintiffs' class claim extended to women who opposed, in any way, the Agency's discrimination. "Fair notice", such as this, is all that is required. *Conley v. Gibson*, 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957). The Court also notes that throughout the period for discovery and the trial in this case, the defendant has not objected to any evidence on the basis that it was beyond the scope of the complaint. Thus, the class retaliation claim is not limited to plaintiffs who filed EEO charges; it encompasses all plaintiffs who have opposed the Agency's discriminatory practices.

BECAUSE THE PLAINTIFFS HAVE FAILED TO PROVE A PATTERN OR PRACTICE OF REPRISALS, THEY HAVE NOT ESTABLISHED A PRIMA FACIE CASE OF CLASS–WIDE RETALIATION

██ The analytical framework for a retaliation claim derives from that announced in *McDonnell Douglas, supra*. To establish a prima facie case, an individual plaintiff must show that (1) she engaged in a protected opposition to unlawful discrimination, (2) her employer subsequently took an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse action. *Burrus v. United Telephone Company of Kansas, Inc.*, 683 F.2d 339, 343 (10th Cir.), cert. denied, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982); *Hickman v. Flood & Peterson Insurance*, 29 Fair Empl. Prac. Cases 1467, 1469 (D.C.Colo.1982). The present case involves a class claim of retaliation, however, not an individual one.

Claims based upon retaliation are "generally personal in nature." *Pendleton v. Crown, Cork & Seal Co.*, 31 Fair Empl. Prac.Cases 1701, 1705 (D.Md.1980). *See also Colbert v. City of Wichita*, 33 Fair Empl.Prac.Cases 218, 220 (D.Kan.1983) (retaliation usually takes many forms, and thus it is not well-suited for class treatment). Thus, there are very few cases involving class claims of retaliation such as this one. Because retaliation manifests itself in many ways, and often turns on facts peculiar to each case, the Court holds that, to establish a *prima facie* case, the retaliation must have been pursuant to a general practice of the defendant. *Cf. General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 159 n. 15, 102 S.Ct. 2364, 2371 n. 15, 72 L.Ed.2d 740 (1982) (rejecting class certification for "across-the-board" attacks against various discriminatory practices, but leaving open the possibility that a single general practice of discrimination could justify a class, because "it is noteworthy that Title VII prohibits discriminatory employment *practices*, not an abstract policy

of discrimination.") (emphasis in original).[2] Therefore, in the analytical framework mentioned above, step (2) must be modified in class actions to reflect the requirement that the adverse actions must have been taken pursuant to a general practice or policy of the defendant.

In presenting this class retaliation claim against the Agency, the plaintiffs chiefly rely upon deposition testimony, and related exhibits, of six female Agency employees. Plaintiffs' Post-Remand Brief on Class Retaliation Claims at 1. As explained below, this evidence is insufficient to establish a general practice of reprisals taken by the Agency, and thus the plaintiffs have failed to present a *prima facie* case of retaliation.

Ms. Barbara Callihan testified for the plaintiffs. She was employed in the Current Affairs Division of the Voice of America as a researcher/writer. She complained to her supervisor, Mr. Hanu, that she felt that she was being asked to do secretarial-type duties. After she complained in writing about typing duties, Mr. Hanu wrote her a note stating, "As I told you before, no one refuses *any type* work in this division. If you are still unclear about your duties in this division, please consult your job description which, I am sure, contains the clause 'plus any other type work assigned,' etc. And if you are still unsatisfied, I will have to accept your resignation." (Callihan Exhibit # 1).

However, Ms. Callihan also testified that Mr. Hanu's temper was not aimed solely at women. She stated, "if you are asking me if he is picking on women, I couldn't tell you. I don't think he does." (Callihan Deposition, 108). She further stated, in response to a question about whether his disagreements with employees was limited to women, "[m]an or woman, black or white, it doesn't make a bit of difference if he is upset with you, but look out." *Id.* Finally, Ms. Callihan testified that she knew of no one who was threatened with reprisals for their participation in the suit. *Id.* at 115.

Ms. Michala de Souza was a foreign language broadcaster in the Czechoslovakian Service who felt that she was assigned secretarial duties. She once complained to her supervisors, who responded that, because she was an alien, she should not complaint. (de Souza Deposition, 26–27, 58). Although she was frightened, *id.* at 34, after speaking with an Agency personnel officer, the situation was resolved to her satisfaction. *Id.* at 61. In fact, by the time of her deposition, she had recently been promoted. *Id.* at 59.

The plaintiffs also rely upon the deposition testimony of Anita K. Tong, who was employed in the Chinese Service as a producer. She complained to a union representative that she was required to perform greater services for less pay than males in the same job. (Tong Deposition, 43–44). She testified that she was severely criticized by her supervisors afterwards. *Id.* at 45–46. And, after her deposition, one of these supervisors signed an unfavorable performance evaluation for Ms. Tong. (Tr. 5/31/79, 46–48).

Ms. Deborah Showalter also testified. Although she was a college graduate, she applied and was hired as a clerk/typist. (Showalter Deposition, 6). She received some professional duties as a writer even though she remained a clerk/typist. *Id.* at 25. She felt as though she deserved a promotion, and she went over her supervisors' heads to speak to the Deputy Admin-

---

**2.** The Court realizes that *Falcon* did not rule on the merits of the claim, but denied class certification. The Court also recognizes that, under Rule 23(c), Fed.R.Civ.P., it could even now deny certification. *Cf. Larionoff v. United States,* 533 F.2d 1167, 1183 (D.C.Cir.1976), *aff'd* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977); *Jimenez v. Weinberger,* 523 F.2d 689, 697 (7th Cir. 1975), *cert. denied sub nom., Mathews v. Jimenez,* 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1204 (1976) (both cases ruling on class certification when also deciding the case on the merits). However, it has been over five years since this case was first filed, and the Court considers it best to finally reach the merits of this retaliation claim. This also seems to be what the Court of Appeals had in mind when it remanded this claim for findings of fact and conclusions of law. 686 F.2d at 1011.

istrator concerning a promotion. *Id.* at 26–27. This upset her supervisors, one of whom was Mr. Hanu. Ms. Showalter sought the help of a union representative to obtain a promotion. *Id.* at 46–60. Mr. Hanu had apparently called her a troublemaker, and at a staff meeting, he inaccurately stated that she had filed a class action against him. *Id.* at 71, 73–75. After realizing that his information was incorrect, Mr. Hanu publicly retracted the statement and personally apologized to Ms. Showalter. *Id.* at 83. As previously noted, some plaintiffs testified about Mr. Hanu's temper, and that his disagreements are not limited to women. (Callihan Deposition at 108).

Ms. Etel Berger, a GS–9 foreign language broadcaster in the Brazilian Branch of Voice of America, testified as to Agency reprisals. She felt that she was performing the same duties as others at GS–11 or GS–12 levels. (Berger Exhibit # 8). She felt as though she would not receive a promotion, so she wrote a letter to the Director of Personnel announcing her intention to leave. (Berger Exhibit # 9). Her supervisors then called her in for a meeting to discuss her problems. (Berger Deposition, 100). One of her supervisors, Ms. Lucille DePalma, did not like the way her voice sounded on the air, and suggested that she take some lessons on how to improve it. *Id.* at 102. Ms. DePalma also stated that Ms. Berger did not have enough experience to handle a particular show ("Informe") because she had not worked on weekends, where the broadcast format is less structured and less supervised. *Id.* Ms. Berger said that she "welcome[d] the opportunity to" try the weekend work, and she was thereafter assigned such work. *Id.* at 102, 107. After she performed a particular Saturday show, the senior producer in the Brazilian Department applauded and congratulated her. *Id.* at 107–08. Also, after learning of Ms. Berger's expressed intention to leave the Agency, the assistant to the Director of Voice of America had personally called her to express her appreciation for her work and to assure her

that she would get a grade raise. *Id.* at 148.

Ms. Rose Kobylinski, the remaining individual plaintiff, testified that some women expressed fear for her because she was participating in the suit. (Tr. 5/30/79, 158). The plaintiffs have not demonstrated the grounds for this expressed fear. Nor is there any evidence that Ms. Kobylinski suffered reprisals for her participation in this case.

The plaintiff's evidence does not establish the requisite policy or practice of discrimination. The plaintiffs chiefly rely upon the testimony of only six witnesses. Some (but probably not all) of these witnesses may have been able to substantiate individual claims of retaliation. However, there is no evidence of a general policy of retaliation in the Agency. The plaintiffs have presented no evidence linking these incidents. The alleged reprisals took various forms and came from various officials. In short, there is insufficient evidence to overturn this Court's October 24, 1979, Finding of Fact that there is an "absence of any pattern or practice of discrimination based on sex at the Agency at all relevant periods in this litigation." *Medina v. Reinhardt*, Nos. 77–0360, 77–2019, and 78–0762, slip op. at 11 (D.D.C. Oct. 24, 1979) (hereafter "slip op."). Therefore, the plaintiffs have failed to establish a *prima facie* case of class-wide discrimination in the form of retaliation.

## THE COURT FINDS THAT THE AGENCY DISCRIMINATED AGAINST WOMEN IN HIRING

During the trial of this case the Court heard considerable testimony from statistical experts. Each side presented an expert who subdivided the Agency's workforce into occupational categories and sought to translate ("cross-map") each Agency category into a Census category. Thus, the experts agreed on the basic methodology involved in defining the relevant labor market. However, in some instances, they disagreed as to which specific Census categories they would compare to the Agency's

occupational categories. In its October 24, 1979 Findings of Fact and Conclusions of Law, this Court held that the cross-mapping presented by both sides was insufficient to gain meaningful insight into whether the Agency's hiring practices were discriminatory:

> The Court finds that both plaintiffs' and defendant's experts have failed to produce sufficiently precise labor-pool-availability figures whether nationally or locally. Due to the inherent unreliability of broad and general cross-mapping with a specialized variety of highly-skilled positions at the Agency as compared to the available Census and BLS [Bureau of Labor Statistics] job categories, the "cross-mapping" done here is of little or no value in the case at bar.

The Court concluded that the plaintiff class had failed to establish a *prima facie* case of discrimination under 42 U.S.C. § 2000e *et seq.*

The Court of Appeals reversed and remanded this part of the Court's decision. After reviewing the Supreme Court's holdings in *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), and *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), the Court stated that this Court required too much precision in the use of statistics:

> The standard of precision the district court demanded, far from being mandated by these cases, is unprecedented and unjustifiable, insofar as it results in a total rejection of the Census data as a basis for statistical comparisons to establish a *prima facie* case.

686 F.2d at 1005.

Noting that the Census has fewer occupational categories than the Civil Service system, the Court of Appeals stated:

> We are satisfied that comparing Agency occupational categories to the broader Census categories is appropriate because all types of jobs the Census includes within any given Census occupational categories are sub-specialties of that oc-

cupation; thus, such aggregations retain "generally similar job skills" in common. *Valentino v. USPS*, 674 F.2d [56] at 68.

686 F.2d at 1006. Thus, the Court will turn to the merits of the class-wide hiring claim, considering the parties' statistics.

In light of the Court of Appeals' decision, this Court must reconsider its previous determination that there was insufficient evidence of a pattern or practice of discrimination at the Agency. (slip op. at 11). As the following analysis demonstrates, after careful scrutiny, the Court has also reconsidered its earlier determination that the conclusions of Dr. Wolfbein, the defendant's expert, are entitled to more weight than those of Dr. Rosenblum, the plaintiff's expert. *Id.* at 7. Upon reconsideration, the Court finds that, in six major occupational categories, which constitute approximately fifty percent of the Agency's work force, the Agency has discriminated against women.

## BECAUSE OF GROSS STATISTICAL DISPARITIES, THE PLAINTIFFS HAVE ESTABLISHED A PRIMA FACIE CASE OF DISCRIMINATION IN HIRING

In *Hazelwood School District v. United States*, the Supreme Court stated:

> Where gross statistical disparities can be shown, they alone may in proper case constitute prima facie proof of a pattern or practice of discrimination.

433 U.S. at 307–08, 97 S.Ct. at 2741–42. Thus, plaintiffs may establish a *prima facie* case by demonstrating that statistically significant disparities exist between the proportion of female Agency employees by job category and their availability in the relevant labor market.

The plaintiff's expert, Dr. Rosenblum, performed a relevant labor market analysis of the Agency's work force to assess its utilization of women in comparison with the availability of women in the relevant labor market. Dr. Rosenblum obtained a list of the fourteen major occupational titles at the Agency. These occupational categories

represented over 75% of the Agency's workforce. Of those fourteen categories, Dr. Rosenblum eliminated four which were primarily clerical in function. Women who had sought employment with the Agency in these occupations are no longer class members since this Court modified the class to exclude women who applied for or were in clerical positions. (Order of October 24, 1979). Dr. Rosenblum then cross-mapped the Agency occupations with occupational categories used by the Bureau of Census.

After completing the cross-mapping, Dr. Rosenblum compared the proportion of women employed by the Agency in each of these ten categories with the proportion of women available in what he considered to be the most appropriate Census category, i.e., the relevant labor market. Dr. Rosenblum examined the Agency's workforce as December 31, 1978. He determined that the disparities were not substantial in four of the ten major job categories. These four categories constituted about thirteen percent of the Agency's total employment.

In six major categories, Dr. Rosenblum found statistically significant disparities between the Agency's utilization of women and the availability of women in the appropriate Census category. These six categories were Electronic Technician, Foreign Language Broadcaster, Production Specialist, Writer/Editor, Foreign Information Specialist, and Radio Broadcast Technician. These six categories constitute about 50% of the Agency's total employment. The following table summarizes Dr. Rosenblum's standard deviation analysis concerning the utilization of women in these six categories:

## UTILIZATION OF FEMALE WORKERS BY THE AGENCY

| Job Title | Employed | Expected | Difference | Significance |
|---|---|---|---|---|
| Electronic Technician | 1 | 10 | 9 | 2.97 S.D. |
| Foreign Language Broadcaster | 60 | 114 | 54 | 10.23 S.D. |
| Production Specialist | 28 | 43 | 15 | 2.82 S.D. |
| Writer, Editor | 94 | 155 | 61 | 6.45 S.D. |
| Foreign Information Specialist | 172 | 388 | 216 | 13.56 S.D. |
| Radio Broadcast Technician | 5 | 64 | 59 | 14.77 S.D. |

As Dr. Rosenblum testified, customary scientific practice recognizes that where the number of standard deviations of the difference exceeds 1.65, the disparity is unlikely to have occurred by chance.[3] (Tr. 5/29/79, 124–125). The underutilization of women was significant in each of these six categories, where the standard deviations ranged from 2.82 to 14.77, in each case well beyond the threshold for statistical significance.

The defendant at this point attacks plaintiffs' statistics in two major respects. The defendant questioned Dr. Rosenblum's focus only on the larger Agency job categories rather than on each of the Agency's occupations. The defendant also disputes the validity of Dr. Rosenblum's cross-mapping to the Census categories in some occupations. As shown below, neither of these attacks defeats plaintiffs' *prima facie* case.

The defendant asserts that Dr. Rosenblum's analysis is flawed because it focuses on only about fifty percent of the Agen-

---

**3.** In addition to the scientific community, the Supreme Court has also approved the use of standard deviation analysis. *See Hazelwood,* 433 U.S. at 311, n. 17, 97 S.Ct. at 2743 *Castaneda v. Partida,* 430 U.S. 482, 496–97, n. 17, 97 S.Ct. 1272, 1281, n. 17, 51 L.Ed.2d 498 (1977).

cy's total employment. First, it must be noted that the class action no longer concerns those Agency employees in clerical positions, so Dr. Rosenblum properly excluded those employees from his analysis. (Slip op. of October 24, 1979, p. 7). Dr. Rosenblum also focused only on the major occupational categories at the Agency, those contained in the Agency's affirmative action plan. (Tr. 5/29/79, 146). Dr. Rosenblum was then left with ten major categories to analyze, which comprised sixty-three percent of the Agency's total work force. *Id.* at 101. Of these ten categories, Dr. Rosenblum found significant underutilization of women in the six explained above. These six categories constituted slightly over fifty percent of the Agency's work force. *Id.* at 147.

To the extent that the defendant quarrels with Dr. Rosenblum's exclusion from analysis of numerically small categories, the defendant's argument misses the mark. Ever since *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 611, 94 S.Ct. 1323, 1328, 39 L.Ed.2d 630 (1974), it has been clear that unreliable statistics based on small sample sizes are discouraged. *See also Valentino v. United States Postal Service*, 674 F.2d 56, 72 (D.C.Cir.1982) (numbers may be too small to properly conduct a statistical analysis, but "small numbers are not *per se* useless, especially if the disparity shown is egregious.")

Moreover, a glance at some of the smaller occupational categories serves to confirm, rather than weaken, plaintiffs' *prima facie* case. Indeed, the disparities seem to reach the "egregious" level mentioned in *Valentino, supra.* The following table, based on Defendant's Exhibit # 6, sets forth twenty-one white collar occupational categories in which the Agency employed no females as of December 31, 1978:

| OCCUPATIONAL CATEGORY | TOTAL | MALES | FEMALES |
|---|---|---|---|
| Guard | 12 | 12 | 0 |
| History | 1 | 1 | 0 |
| Labor Relations | 2 | 2 | 0 |
| Office Service Management | 1 | 1 | 0 |
| Financial Management | 1 | 1 | 0 |
| General Engineer | 2 | 2 | 0 |
| Engineer Technician | 11 | 11 | 0 |
| Civil Engineer | 4 | 4 | 0 |
| Mechanical Engineer | 11 | 11 | 0 |
| Electronic Engineer | 16 | 16 | 0 |
| Photography | 14 | 14 | 0 |
| Tech. Writer & Editor | 1 | 1 | 0 |
| Gen. Facilities & Equipment | 2 | 2 | 0 |
| Facility Management | 4 | 4 | 0 |
| Printing Management | 15 | 15 | 0 |
| Equipment Specialist | 6 | 6 | 0 |
| Training & Instruction | 1 | 1 | 0 |
| General Supply | 2 | 2 | 0 |
| Supply Progress Management | 2 | 2 | 0 |
| Distribution Facilities | 2 | 2 | 0 |
| Traffic Management | 5 | 5 | 0 |
| | 115 | 115 | 0 |

The same exhibit, (Def. # 6), also demonstrates that the Agency employed no women in eighteen of the Agency's twenty-three blue collar categories, where a total of sixty-two men were employed. However, because each of these categories contained sixteen men or fewer, these categories were insufficient in size to determine whether statistically significant disparities existed. Thus, Dr. Rosenblum was justified in eliminating them from his relevant labor market analysis.

In summary, Dr. Rosenblum did not perform a relevant labor market analysis in every Agency job category. Small categories, which could not support a meaningful statistical analysis, were not analyzed. Even in many of those categories, however, it appears that women were underutilized. Although Dr. Rosenblum properly refused to draw conclusions from these categories, *Mayor of Philadelphia*, 415 U.S. at 611, 94 S.Ct. at 1328, the Agency can find little comfort in his failure to analyze them.

The Agency also challenges Dr. Rosenblum's cross-mapping in some of the six particular categories where Dr. Rosenblum found significant underutilization by women. Initially, it is noted that the plaintiffs and defendants agreed on which Census category to use for the Agency category of Electronic Technician. In two other Agency categories, the defendant's choice for the proper Census category still leads to

statistically significant disparities.[4] Concerning the cross-mapping of the other categories, Dr. Rosenblum reviewed the job descriptions contained within the Civil Service Commission's Qualifications Handbook, as well as additional material published by the Agency, to compare them to "the most compatible Census occupation[s]." (Tr. 5/29/79, 65–66). While the experts agreed as to this methodology, they disagreed as to the categories in some instances. The Court, however, finds that this is an area where reasonable experts could disagree. In short, at this *prima facie* case stage, the defendant's attack on Dr. Rosenblum's particular instances of cross-mapping would have the Court impose the "inappropriately high standard of precision" that has been rejected by the Court of Appeals. 686 F.2d at 1007.

Thus, because of the persuasive statistical disparities presented, the plaintiffs have established a *prima facie* case of sex discrimination in hiring for the six major occupational categories. *See Hazelwood,* 433 U.S. at 307–08, 97 S.Ct. at 2741–42 ("where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.")

## THE DEFENDANT'S STATISTICS ARE INSUFFICIENT TO REBUT THE PLAINTIFFS' PRIMA FACIE CASE

█ Once the plaintiffs have established through statistical evidence a pattern or practice of sex discrimination, the burden shifts to the employer to show that the plaintiffs' "proof is either inaccurate or insignificant." *Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867. Here the Agency attempts to rebut the plaintiffs' *prima facie* case through the labor market analysis of its own expert, Dr. Seymour Wolfbein.

Dr. Wolfbein cross-mapped Agency categories to what he considered to be the most appropriate Census category, as did Dr. Rosenblum. Although the experts agreed as to methodology, their approaches differed in certain respects. The defendant, through Dr. Wolfbein, sets forth four main attacks on Dr. Rosenblum's analysis. Dr. Wolfbein initially asserts that Dr. Rosenblum's analysis was flawed because he only focused on approximately fifty percent of the Agency work force. Second, Dr. Wolfbein contends that Dr. Rosenblum's analysis only provided a "snapshot" of the Agency's work force, and did not consider the Agency's hiring statistics over a period of time. Third, Dr. Wolfbein disagrees with Dr. Rosenblum's judgment of which Census categories were appropriate in five of the six major categories where Dr. Rosenblum found significant underutilization of women. Fourth, Dr. Wolfbein asserts that Dr. Rosenblum should not have relied upon the 1978 Current Population Survey for employment data. However, none of these arguments rebuts the *prima facie* case established by the plaintiffs.

As previously explained, *supra* pp. 20–23, Dr. Rosenblum did not simply examine only one half of the Agency's work force. He started with the numerically large categories, covering about seventy-five percent of the work force, then he properly eliminated those in clerical positions. After cross-mapping the remaining ten categories, he found statistically significant underutilization of women in six of those categories. It is these six categories which comprise about fifty percent of the Agency's total employment.

In contrast to Dr. Rosenblum's careful focus only on numerically large categories, Dr. Wolfbein performed a relevant market analysis for virtually all of the Agency's positions, without regard to the size of the categories. Because he failed to take into account the small numerical size of many categories, however, Dr. Wolfbein's analy-

4. Indeed, for the Agency category of Foreign Information Specialist, the plaintiffs chose the Census category of Writers and Artists while the defendant compared it to the Census category of Editors and Reporters. Had Dr. Rosenblum used the defendant's category for comparison, because the availability of women there exceeded that in the Writers and Artists category, the size of the disparity would have *increased.* (Tr. 5/29/79, 161–162).

sis produced some extremely distorted results. For example, using Dr. Wolfbein's cross-mappings and calculations for 1978 figures, Dr. Wolfbein concluded that in the Agency's professional occupations, the proportion of women employed by the Agency exceeded their availability in eight of these occupations, while the proportion of women was below their availability in the remaining eight occupations. Thus, Dr. Wolfbein asserts that this presents a balanced employment of women by the Agency.

Upon closer examination of the actual number of employees involved, however, the distortion of these figures becomes apparent. For example, in some of the categories where Dr. Wolfbein found the Agency to have employed women in proportions exceeding the market availability, the Agency employed the following numbers of employees:

| OCCUPATION | TOTAL | MALES | FEMALES |
|---|---|---|---|
| Lawyer | 10 | 8 | 2 |
| Public Relations | 12 | 6 | 6 |
| Writer (Translator) | 4 | 1 | 3 |
| Research Workers n.e.c.[5] | 20 | 10 | 10 |

The size of these categories stands in stark contrast to two of the professional occupations where Dr. Wolfbein found a proportionately low number of women employees:

| OCCUPATION | TOTAL | MALES | FEMALES |
|---|---|---|---|
| Editors & Reporters | 1,506 | 1,224 | 282 |
| Technician | 276 | 270 | 6 |

These numbers alone clearly demonstrate that Dr. Wolfbein's attack on Dr. Rosenblum's focus on large categories cannot be sustained. It is apparent that Dr. Rosenblum properly rejected categories with few employees. *See Mayor of Philadelphia,* 415 U.S. at 611, 94 S.Ct. at 1328.

Dr. Wolfbein's hiring analysis suffers from the same problem as his utilization analysis: Dr. Wolfbein did not take into account the disproportionate results that numerically small categories would produce. In four of the nine professional job categories where Dr. Wolfbein found that the agency hired, from 1973 to 1978, more women proportionately than were available in the relevant labor market, the actual numbers are insignificant:

FULL TIME HIRES BY OCCUPATION, 1973–1978

| OCCUPATION | TOTAL | MALES | FEMALES |
|---|---|---|---|
| Lawyer | 12 | 11 | 1 |
| Public Relations | 4 | 1 | 3 |
| Writer (Translator) | 3 | 2 | 1 |
| Research Workers, n.e.c. | 7 | 3 | 4 |

In contrast to these small numbers are two of the seven professional categories where Dr. Wolfbein found a disproportionately low number of women hires:

FULL TIME HIRES BY OCCUPATION, 1973–1978

| OCCUPATION | TOTAL | MALES | FEMALES |
|---|---|---|---|
| Editors & Reporters | 436 | 299 | 137 |
| Technician | 103 | 103 | 0 |

In light of these disproportionate results, Dr. Wolfbein's hiring figures obviously cannot rebut plaintiffs' *prima facie* case. Dr. Wolfbein simply has failed to show that Dr. Rosenblum's focus on the statistically large categories is "inaccurate or insignificant." *See Teamsters,* 431 U.S. at 360, 97 S.Ct. at 1867.

Dr. Wolfbein also attacks Dr. Rosenblum's use of the 1978 Current Population Survey data. Dr. Wolfbein himself used data from the 1970 Decennial Census. Although the Current Population Survey used a smaller sample than did the Census, Dr. Wolfbein has failed to show that the figures are unreliable. Moreover, the 1978 figures are, of course, more recent than the 1970 figures. Thus, the Court finds that the choice of the more recent 1978 Current Population Survey statistics was a reasonable one.

Dr. Wolfbein's final rebuttal argument attacks Dr. Rosenblum's cross-mapping in four of the six relevant categories. When each category is individually analyzed, however, one can see that Dr. Rosenblum carefully selected an appropriate Census category for the cross-mapping.

For the Agency category of Radio Broadcast Technician, Dr. Rosenblum chose the Census Radio Operator category. Dr. Wolfbein disagreed, choosing the Census

5. The abbreviation "n.e.c." stands for "not else-   where classified."

Electronic Technician category. However, even using the cross-mapping chosen by Dr. Wolfbein, both experts agreed that the Agency underutilized women in the Radio Broadcast Technician category to a statistically significant degree. (Tr. 5/29/79, 160–61; Tr. 6/1/79, 99).

Dr. Rosenblum cross-mapped the Agency category of Foreign Information Specialist with the Census category of Writers and Artists not elsewhere classified. Dr. Wolfbein compared it to the Census category of Editors and Reporters. However, the availability of women in the Editors and Reporters category exceeded the availability of women in the category of Writers and Artists not elsewhere classified. Thus, had Dr. Rosenblum accepted Dr. Wolfbein's cross-mapping in this category, the disparity found by Dr. Rosenblum would have increased.

Dr. Rosenblum compared the number of women employed as Foreign Language Broadcasters with the availability of women in the Census category of Editors and Reporters. Dr. Wolfbein chose the Census category of Radio Announcers. However, the record demonstrates that Dr. Rosenblum's choice was well-reasoned. He considered the duties required in that Agency position, and concluded that the Census Editors and Reporters category was the most appropriate "because of the emphasis on the writing and the preparation of the material." (Tr. 5/29/79, 99). This conclusion is supported by the testimonial evidence of Agency employees in the Foreign Language Broadcaster category. Ms. Michala de Souza testified that her Broadcaster job involved duties such as "working on the programming, translating, writing, narrating, editing, ...." (de Souza Deposition, 22). Because of the consideration of the duties of a Foreign Language Broadcaster, Dr. Rosenblum's choice of Editors and Reporters was an appropriate one. Dr. Wolfbein has failed to show that his choice was more appropriate.

Dr. Rosenblum cross-mapped Audio Visual Production Specialists with Writers and Artists, while Dr. Wolfbein compared them to the Census managerial category. Ms. Luba Medina testified that, as a producer, she was required to select and edit musical inserts, produce live radio shows, coach announcers, and control the timing of shows. (Tr. 12/15/80, 41–49). She also testified that the nonprofessional duties were simply "incidental", and "not the essence of [her] job." *Id.* at 44. This uncontradicted testimony demonstrates that the skills required of an Agency Audio Visual Specialist were those of a professional artist rather than a manager. Thus, Dr. Rosenblum properly chose the Writers and Artists category for this cross-mapping.

In sum, the defendant's rebuttal attack on Dr. Rosenblum's statistical analysis fails on all fronts. Dr. Rosenblum considered all statistically meaningful categories at the Agency, and found significant disparities in six major categories. Although he analyzed the Agency's work force at a specific point in time, the defendant's hiring statistics are clearly insufficient to rebut the plaintiffs' *prima facie* case. Dr. Rosenblum's use of the 1978 Current Population Survey figures was justified because those statistics were much more current than the 1970 Census figures used by Dr. Wolfbein. Finally, Dr. Rosenblum carefully and appropriately cross-mapped each Agency category he considered. Therefore, the plaintiffs have presented and unrebutted *prima facie* case of sex discrimination at the Agency. This discrimination was particularly meaningful in six major Agency occupations. The Court finds that the plaintiffs are entitled to judgment in these six categories, which constitute approximately fifty percent of the Agency's employment. *See United States v. County of Fairfax*, 25 Fair Empl. Prac.Cases 662, 666 (E.D.Va.1981) (where the court found liability in particular occupational categories).

## CONCLUSION

The Court today has found that the Agency discriminated against the individual plaintiff, Rose Kobylinski, with respect to a promotion opportunity. The Court has

also found significant discrimination against women as a class with regard to hiring in non-clerical Agency positions. This discrimination is meaningful in six major occupational categories, and the Court's holding is limited to those categories. Finally, the Court has decided that the Agency did not maintain a pattern or practice of discrimination in the form of retaliation. In view of the fact that this case was bifurcated into liability and relief stages, the Court will next proceed to the question of relief. The Court has today issued an Order consistent with this Opinion, which Order shall direct the parties to attend a status call to address the question of further proceedings.

### ORDER

For the reasons set forth in the Court's Opinion of even date herewith, it is, by the Court, this 16th day of November, 1984,

ORDERED: That judgment as to liability be, and the same hereby is, entered against the defendant for the individual discrimination claim of Ms. Rose Kobylinski; and it is

FURTHER ORDERED: That judgment as to liability be, and the same hereby is, entered against the plaintiffs for the class claim of retaliation; and it is

FURTHER ORDERED: That judgment as to liability be, and the same hereby is, entered against the defendant for the class claim of discrimination in hiring; and it is

FURTHER ORDERED: that this case shall be set down for a status conference, to be held on the 3rd day of January, 1985, at 10:00 A.M. in Courtroom 11, at which time the Court will consider further proceedings in this case.