19 F.3d 1459
 64 Empl. Prac. Dec. P 43,001, 305 U.S.App.D.C. 256
 Carolee Brady HARTMAN; All Other Plaintiffs, Approx. 50
Additional Plaintiffs, Plaintiffs-Appellants,
v.
Joseph DUFFEY, Director, United States Information Agency;
All Other Defendants, One Additional Defendant,
Defendants-Appellees.
Carolee Brady HARTMAN; All Other Plaintiffs, Approx. 50
Additional Plaintiffs, Plaintiffs-Appellees,
v.
Joseph DUFFEY, Director, United States Information Agency;
All Other Defendants, One Additional Defendant,
Defendants-Appellants.
 Nos. 92-5347, 92-5325.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 1, 1994.
Decided April 5, 1994.
 
 Douglas A. Wickham, Asst. U.S. Atty., argued the cause for appellant/cross-appellee. With him on the briefs were Eric Holder, Jr., U.S. Atty., John Oliver Birch, R. Craig Lawrence, Robert L. Shapiro and Daniel Van Horn, Asst. U.S. Attys. John D. Bates entered an appearance and Terri A. Zall, Sp. Asst. U.S. Atty.
 Bruce A. Fredrickson argued the cause for appellee/cross-appellant. With him on the briefs was Susan L. Brackshaw.
 Before: WALD, HENDERSON, and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WALD.
 Separate concurring opinion as to Part II-B. filed by Circuit Judge RANDOLPH with whom Circuit Judge HENDERSON concurs.*
 WALD, Circuit Judge:
 
 
 1
 This is an interlocutory appeal from an order of the district court in a gender discrimination class action initiated in 1978 on behalf of women who unsuccessfully applied for civil service and foreign service positions at the United States Information Agency ("USIA" or "Agency"). In that order, the district court required the Agency to set aside thirty-nine foreign service positions for remedial allocation to women who had applied for foreign service officer positions at the USIA during the liability period but were ultimately denied employment. Hartman v. Gelb,[1] No. 77-2019 (D.D.C. July 9, 1992) reprinted in Joint Appendix ("J.A.") at 337. After fifteen years of proceedings including a finding of liability entered against the USIA in 1984, Hartman v. Wick, 600 F.Supp. 361 (D.D.C.1984), an order establishing the remedial framework in 1988, Hartman v. Wick, 678 F.Supp. 312 (D.D.C.1988), and the Agency's resulting expenditure of over $2 million to notify potential class members of available remedies, the USIA raises in an appeal for the first time the issue of whether the class certification back in 1978 was appropriate.
 
 
 2
 Since unfortunately we are unable to decide on the record before us that this suit is properly certified as a class action, we are compelled to remand the case to the district court to make the necessary findings on and to consider possible revisions to the original class certification. Cautiously deciding at this juncture only what we have to, we resist appellant's suggestion to review the merits of the district court's 1984 liability findings. Since a modified class certification could also moot any dispute about the number of remedial foreign service slots, we do not decide that issue either.
 
 I. BACKGROUND
 
 3
 In March 1977, Luba Medina, a former Agency employee, brought an individual complaint under Title VII of the Civil Rights Act of 1964, as amended by the Equal Employment Opportunity Act of 1972, 42 U.S.C. Secs. 2000e-2000e-17, alleging that the Agency had failed to rehire her on the basis of her gender, in retaliation for her own prior charges of gender discrimination, and because of her husband's representation of minorities in Equal Employment Opportunity Commission ("EEOC") actions.
 
 
 4
 On November 25, 1978, Carolee Brady Hartman filed this civil suit as a class action on behalf of herself and all other women "who have made applications to work for and/or are currently employed by the United States Information Agency ... and who have been and continue to be adversely affected by the [Agency's sexually discriminatory] employment practices." J.A. at 1, 1-2. Specifically as to herself, Ms. Hartman alleged that she had interviewed for the position of writer/editor with the USIA's Horizon magazine, that the male interviewer "stated that [p]laintiff was very well qualified for the position," but "stated to [p]laintiff that he was looking for a male to fill the writer/editor position," and that after plaintiff's rejection the position remained open and the USIA continued to seek applicants. J.A. at 4.
 
 
 5
 In February 1978, Ms. Hartman moved for class certification pursuant to Rule 23(b)(2) & (c)(1) of the Federal Rules of Civil Procedure, J.A. at 20, and in April, 1978, the district court conditionally certified the class of "all women who have applied for employment with or are currently employed by the [USIA] and who have been or continue to be adversely affected by the [USIA's] discriminatory employment practices," J.A. at 48.
 
 
 6
 In late April, 1978, Toura Kem brought an individual Title VII action against the USIA alleging that she had been denied a permanent Agency position on account of her gender. Later that year, the district court permitted Ms. Medina and two Agency employees, Josefina Martinez and Rose Kobylinski, to intervene in the class action as named plaintiffs and finally consolidated the three actions of Ms. Hartman, Ms. Kem, and Ms. Medina. J.A. at 49, 53, 54.
 
 
 7
 The parties agreed to bifurcate the trial of the class claims into a liability and remedy stage. Cf. International Bhd. of Teamsters v. United States, 431 U.S. 324, 360-61, 97 S.Ct. 1843, 1867-68, 52 L.Ed.2d 396 (1977) (describing such bifurcation of trial). After a bench trial on the class liability issues, the district court modified the class to exclude women in clerical positions and entered a judgment for defendant on all counts because plaintiffs had failed to establish a prima facie case of gender discrimination. De Medina v. Reinhardt, 444 F.Supp. 573, 21 Fair Empl.Prac.Cas. (BNA) 75 (D.D.C.1978). After three of the named plaintiffs voluntarily dismissed their claims and after conducting a trial on the individual claims of Ms. Kobylinski and Ms. Medina, the district court further dismissed Ms. Medina's claim on the merits and Ms. Kobylinski's claim because she had failed to exhaust her administrative remedies. De Medina, Nos. 77-0360, 77-2019 & 78-0762 (D.D.C. June 15, 1981).
 
 
 8
 On appeal in 1982, we upheld the district court's rejection of the class promotion discrimination claim and reversed the dismissal of the class hiring discrimination claim because the district court's opinion "reflect[ed] a basic misperception of the relevancy and role of statistical evidence in the plaintiffs' prima facie showing." De Medina, 686 F.2d 997 (D.C.Cir.1982). In addition to ordering the reconsideration of the class hiring claim, we instructed the trial judge on remand to make specific findings on the class retaliation claim. Id. at 1011-12. We reversed the dismissal of Ms. Kobylinski's individual claim and affirmed the rejection of Ms. Medina's. Id. at 1012-15.
 
 
 9
 By stipulation of the parties, the trial court on remand reconsidered the case without further development of the record. Although denying the class retaliation claim, the court found, after reconsidering its earlier dismissal of the statistical evidence, that the Agency had discriminated against women in hiring for six occupation categories. Hartman v. Wick, 600 F.Supp. 361 (D.D.C.1984). The court also entered judgment in favor of Ms. Kobylinski's individual claim.
 
 
 10
 In 1988, the district court in a detailed opinion ruled on the framework for the relief to be afforded the plaintiff class. Hartman v. Wick, 678 F.Supp. 312 (D.D.C.1988). Unless the parties agreed on a different procedure, class members who had applied for a civil service position at the USIA would be given individualized Teamster hearings to assess appropriate relief. Id. at 333 (citing Teamsters, 431 U.S. at 372, 97 S.Ct. at 1873).[2] A class member who prevailed at her Teamsters hearing would be entitled to "full make-whole relief under Title VII," including back pay and appropriate reinstatement or front pay. Id. at 335-37.
 
 
 11
 In the case of foreign service officer hires at the Agency, the court further ruled that class members who had applied for foreign service jobs at the USIA would be permitted to compete for a designated number of such positions to be specially set aside by the Agency for class relief purposes. Id. at 338-40. The court ordered the USIA to prepare a rank-ordered list of the women who had unsuccessfully applied for foreign service officer positions during the period of liability. However, the court postponed decision on the final number of such reserved slots pending further briefing. On the basis of the liability finding in 1984, the court required the Agency to bear the costs of notifying potential class members about the relief. Finally, the court denied plaintiffs' request for any further prospective relief. Id. at 340-41.
 
 
 12
 Since 1988, more than 30,000 women have been contacted and more than 10,000 women are currently participating in the relief process, at a cost to the defendant of roughly $2 million. Reply Brief for Appellees at 19 n. 8 & 20 n. 9.
 
 
 13
 In July 1992, the court ordered the Agency to set aside thirty-nine foreign service positions over the next three years for women on the rank-ordered list of unsuccessful foreign service applicants. Hartman v. Gelb, No. 77-2019 (July 9, 1992), reprinted in J.A. at 337. It is this last order from which the Agency now appeals challenging not only the number of remedial foreign service positions, but, more basically, the district court's 1984 liability determination and the original 1978 class certification. Plaintiffs cross-appealed, arguing that a greater number of remedial foreign service positions was required as well as other types of prospective relief denied by the district court in 1988.
 
 II. ANALYSIS
 A. Jurisdiction
 
 14
 The Agency appeals from the 1992 order pursuant to 28 U.S.C. Sec. 1292(a) which provides in part:
 
 
 15
 [T]he courts of appeals shall have jurisdiction of appeals from:
 
 
 16
 (1) Interlocutory orders of the district courts of the United States ... or of the judges thereof, granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions....
 
 
 17
 As the Supreme Court noted in Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978), this "exception from the long-established policy against piecemeal appeals ... is a narrow one and is keyed to the 'need to permit litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence.' " Id. at 480, 98 S.Ct. at 2453 (quoting Baltimore Contractors, Inc. v. Bodinger, 348 U.S. 176, 181, 75 S.Ct. 249, 252, 99 L.Ed. 233 (1955)). "The exception does not embrace orders that have no direct or irreparable impact on the merits of the controversy." Id. at 482, 75 S.Ct. at 253.
 
 
 18
 In this case, the trial court's 1988 order laid down the basic framework of relief for both the civil service and the foreign service subgroups of the class, reserving for future decision only the exact number of foreign service officer positions to be set aside. Accordingly, the appellee class members maintain that the 1992 order decided only an ancillary issue to the 1988 relief order, and since the Agency never appealed the 1988 order, it may not belatedly challenge anything in it in the context of this appeal. Either the review of the number of slots should be postponed to the end of the entire litigation or this appeal should decide only that narrow question. The question is close, but on balance, we disagree with such a restriction.
 
 
 19
 Whether or not the 1988 remedial decision would have qualified in its own right as an appealable injunction under Sec. 1292(a)(1) (because it ordered the USIA to bear the costs of notifying class members and compile a rank-ordered list of unsuccessful foreign service applicants), the 1992 order cannot be dismissed as mere litigation housekeeping. The 1992 order affirmatively required the Agency to set aside thirty-nine foreign service positions and to fill thirteen of these positions for each of the next three years with plaintiff class members. Thus, it provided a portion of the substantive relief sought by plaintiffs in this suit, and its effect was to enjoin partially the USIA's usual hiring policies. See Carson v. American Brands, Inc., 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981) (holding court's refusal to enter a consent decree subject to interlocutory appeal because, inter alia, petitioners had "sought an immediate restructuring of respondents' transfer and promotional policies" and asserted irreparable injury caused by any delay). Indeed, the first thirteen entry-level foreign service officers have already been hired and are currently in training with the USIA. Brief for Appellees at 42. The imposition of this special hiring requirement clearly qualifies the 1992 order as an injunction appealable at this time so that the USIA can "effectually challenge" the order's direct and, arguably, irreparable impact.
 
 
 20
 As we reiterated in Wagner v. Taylor, 836 F.2d 578 (D.C.Cir.1987), once jurisdiction is properly invoked under Sec. 1292(a)(1):
 
 
 21
 "[r]eview quite properly extends to all matters inextricably bound up with the remedial decision.... [T]he scope of review may extend further to allow disposition of all matters appropriately raised by the record, including entry of final judgment. Jurisdiction of the interlocutory appeal is in large measure jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the court of appeals without further trial court development."
 
 
 22
 Id. at 585 (quoting 16 CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE Sec. 3921 p. 17 (1977)). Accord Energy Action Educ. Found. v. Andrus, 654 F.2d 735, 745 n. 54 (D.C.Cir.1980) (quoting same), rev'd on other grounds sub nom. Watt v. Energy Action Educ. Found., 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981). Nonetheless, cognizant of the danger of wide net-casting, we have also repeatedly cautioned that matters so reviewed must indeed be " 'closely related' " to the subject of the interlocutory appeal itself. Id. (quoting Energy Action Educ. Found., 654 F.2d at 746 n. 54).
 
 
 23
 In the instant case, we conclude that the decision to reserve thirty-nine foreign service positions for the plaintiff class is inextricably bound up with the heart and soul of this protracted litigation, and particularly with the thorny issue of class certification. Only if the scope of the trial court's class certification as well as the merits of the class hiring discrimination claim with respect to foreign service officers is sustainable, can the court's 1992 decision to allot thirty-nine remedial foreign service positions withstand attack. See Fentron Indus., Inc. v. National Shopmen Pension Fund, 674 F.2d 1300 (9th Cir.1982). Far from contravening Gardner 's policy against fragmentary appeals, closure on these fundamental issues in the suit is necessary to provide a proper groundwork for the allocation order being appealed. At this juncture, however, we need not review the merits of the trial court's liability determination because that issue is itself inevitably bound up with the determination of the class certification. Since, unfortunately, we are not able finally to decide the class certification on this record, but must remand the case for further findings and consideration of that issue by the trial court, we must leave the liability review until the next round as well.
 
 
 24
 B. Waiver**
 
 
 25
 Appellees first argue that the Agency waived their challenge to class certification by failing to raise it at the appropriate time and by affirmatively stipulating later on in the proceedings that the removal of Ms. Medina as class representative did not affect the integrity of the class action.
 
 
 26
 A litigant who has sufficient opportunity to raise a challenge on an initial appeal but fails to do so, is deemed to have waived the challenge and will not be allowed to argue the issue on a later appeal. Northwestern Indiana Tel. Co. v. Federal Communications Comm'n, 872 F.2d 465, 470 (D.C.Cir.1989), cert. denied, 493 U.S. 1035, 110 S.Ct. 757, 107 L.Ed.2d 773 (1990); Williamsburg Wax Museum, Inc. v. Historic Figures, Inc., 810 F.2d 243, 250 (D.C.Cir.1987); Laffey v. Northwest Airlines, Inc., 740 F.2d 1071 (D.C.Cir.1984) (per curiam), cert. denied, 469 U.S. 1181, 105 S.Ct. 939, 83 L.Ed.2d 951 (1985); see also 18 WRIGHT, supra, at Sec. 4478 (1981 & Supp.1993). An appellate court invokes its inherent power to reconsider an issue already decided or not raised on a prior appeal reluctantly and sparingly to avoid the "bizarre result, ... 'that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost.' " Laffey, 740 F.2d at 1089-90 (quoting Fogel v. Chestnutt, 668 F.2d 100, 109 (2d Cir.1981) (per Friendly, J.), cert. denied, 459 U.S. 828, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982)).
 
 
 27
 Even where it is the opposing party who has lodged the direct appeal, a litigant must raise any challenge of his own to the trial proceeding by filing a cross-appeal even though he might not otherwise have chosen to appeal at that time. See Bethea v. Levi Strauss & Co., 916 F.2d 453 (8th Cir.1990) ("Bethea's failure to file a cross-appeal [challenging the trial court's denial of additional relief] estopped him from requesting further relief from the Eighth Circuit [on appeal as well as on a potential] ... rehearing.").[3] Thus, while a litigant generally need not cross-appeal if he seeks only to sustain the lower court's decision, he will not be permitted to enlarge his rights on appeal in the absence of having filed a cross-appeal. See generally 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE, p 204.11 (2D ED.1993 & Supp.1993-94); cf. Robert L. Stern, When to Cross-Appeal or Cross-Petition--Certainty or Confusion?, 87 HARV.L.REV. 763 (1974). On the other hand, where the opposing party does not take an appeal, a litigant is under no obligation to appeal at the earliest possible time during litigation. For example, a litigant may decline to take an interlocutory appeal and await final judgment to carry her contentions to the appellate court. In re Dennis Greenman Secur. Litig., 829 F.2d 1539, 1542 (11th Cir.1987); see also 18 WRIGHT, supra, at Sec. 4433.
 
 
 28
 For purposes of this appeal, then, one must examine whether the Agency waived the class certification question in 1982 by failing to cross-appeal it when class members appealed from the trial court's original decision declining to find liability. The first question is whether the USIA could have cross-appealed the class certification issue at that time. If the Agency could not have challenged the class certification in the first appeal, it certainly cannot be deemed to have waived the issue.
 
 
 29
 "Ordinarily, only a party aggrieved by a judgment or order of a district court may exercise the statutory right to appeal therefrom. A party who receives all that he has sought generally is not aggrieved by the judgment affording the relief and cannot appeal from it." Deposit Guaranty Nat'l Bank v. Roper, 445 U.S. 326, 333, 100 S.Ct. 1166, 1171, 63 L.Ed.2d 427 (1980) (citations omitted). Consequently, although the USIA initially opposed class certification, the Agency could not have directly appealed the certification in this case because the district court's 1979 judgment on liability came out in favor of the USIA.
 
 
 30
 Cross-appeals, on the other hand, are not so limited. While some cross-appeals are simply direct appeals by another name, i.e., both parties are equally dissatisfied with the judgment, others are purely protective. In a protective cross-appeal, a party who is generally pleased with the judgment and would have otherwise declined to appeal, will cross-appeal to insure that any errors against his interests are reviewed so that if the main appeal results in modification of the judgment his grievances will be determined as well. Some protective cross-appeals are "conditional" in the sense that the cross-appeal is reached only if and when the appellate court decides to reverse or modify the main judgment.
 
 
 31
 The theory for allowing a conditional cross-appeal is that as soon as the appellate court decides to modify the trial court's judgment, that judgment may become "adverse" to the cross-appellant's interests and thus qualify as fair game for an appeal:
 
 
 32
 A party who fully prevailed in the district court may have an equally obvious justification for cross-appeal, to protect interests that otherwise might be adversely affected by disposition of the appeal. Courts readily understand this principle, and have applied it without difficulty, permitting the cross-appeals but deciding them only if disposition of the appeal makes it appropriate.
 
 
 33
 15A WRIGHT, supra, at Sec. 3902 p. 78 (2D ED.1992) (footnote omitted). See, e.g., Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp., 626 F.2d 280, 290 (3d Cir.1980) ("[Appellee] has filed a cross-appeal that is conditional on our reversing the judgment in its favor. Inasmuch as we have reversed the judgment in its favor, we now turn to the claim by [cross-appellant] that it is entitled to a new trial."); Hilton v. Mumaw, 522 F.2d 588, 603 (9th Cir.1975) ("An otherwise nonfinal order may become cross-appealable upon the entry of a final order. Nor does it lack cross-appealability because the final order from which the direct appeal was taken was entirely favorable to cross-appellants. The risk that they might become aggrieved upon reversal on the direct appeal is sufficient." (citations omitted)); see also School Bd. v. Malone, 762 F.2d 1210 (4th Cir.1985); American Mart Corp. v. Joseph E. Seagram & Sons, Inc., 824 F.2d 733 (9th Cir.1987). In this case, the fact that the USIA was the prevailing party on the merits in the 1979 trial court decision would not have precluded it from challenging class certification on conditional cross-appeal, since if the original liability dismissal was overturned, its potential exposure to new liability on remand would be enhanced by maintaining the suit as a class action.
 
 
 34
 However, there are additional obstacles to a conditional cross-appeal of class certification. A class certification order is an interlocutory order not ordinarily appealable until entry of final judgment. Coopers & Lybrand v. Livesay, 437 U.S. 463, 470, 98 S.Ct. 2454, 2459, 57 L.Ed.2d 351 (1978). With entry of the 1979 judgment in favor of the USIA, however, the class certification order had merged into a final judgment dismissing the action and so at first glance it would seem to be appealable as part of that final judgment.
 
 
 35
 But a second look shows that proposition not to be without doubt either. Indeed, Ninth Circuit jurisprudence
 
 
 36
 suggest[s] a general rule that interlocutory orders regarding certification and decertification of class actions should not be reviewed by ... court[§ of appeals] when the judgment pursuant to which appeal was taken is reversed or vacated and the case remanded. In such cases, a certification or decertification order need not be immediately reviewed, because on remand another final judgment will eventually be entered which will support review of the order.
 
 
 37
 Weil v. Investment/Indicators, Research and Management, Inc., 647 F.2d 18, 27 (9th Cir.1981). Accord Blake v. City of Los Angeles, 595 F.2d 1367, 1386 (9th Cir.1979), cert. denied, 446 U.S. 928, 100 S.Ct. 1865, 64 L.Ed.2d 281 (1980); Marks v. San Francisco Real Estate Bd., 627 F.2d 947, 952 (9th Cir.1980) (Kennedy, J., concurring). Blake involved a conditional cross-appeal of class certification much like the one the USIA might have brought back in 1982. The Blake appellant had won a judgment in the trial court but understandably cross-appealed to "ask th[e] court [of appeals], in the event any issue is remanded for further proceedings, to instruct the district court to re-examine the class certification order." 595 F.2d at 1385. The court of appeals declined the invitation noting that "[t]he same considerations that normally bar interlocutory review of class certification orders ... persuade us that we should not now review the class certification order merely because the district court erroneously entered summary judgment for appellees." Id. at 1386 (citations omitted). The court concluded by noting that "[n]othing precludes appellees from obtaining review of the order after final judgment ultimately is entered." Id. (citing Coopers & Lybrand, 437 U.S. at 469, 98 S.Ct. at 2458).
 
 
 38
 The Seventh Circuit, on the other hand, entertained precisely the kind of cross-appeal that was turned back in Blake. In Council 31, American Federation of State, County and Municipal Employees v. Ward, 978 F.2d 373 (7th Cir.1992), the court first reversed the trial court's decision that plaintiffs had failed to establish a prima facie case of employment discrimination and then decided defendant's conditional cross-appeal of class certification.
 
 
 39
 This circuit has gone different ways at different times. As noted above, supra section II-A., we announced in Wagner that " '[j]urisdiction of the interlocutory appeal is in large measure jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the court of appeals without further trial court development.' " 836 F.2d at 585 (quoting 16 WRIGHT, supra, at Sec. 3921 p. 17 (1987)). Factually, however, Wagner was a far narrower holding than its rhetoric might suggest. Appellants had challenged the district court's denial of a preliminary injunction to protect the putative class "solely 'in light of' its contemporaneous denial of class certification." Id. at 586 (footnote omitted). Therefore, review of the class certification issue was indispensable to adjudge the validity of the denial of the preliminary injunction.
 
 
 40
 Wagner 's broader language is nonetheless reflective of the law of this circuit established in other cases. In Fink v. National Savings & Trust Co., 772 F.2d 951 (D.C.Cir.1985), for example, we reviewed a denial of class certification in the course of overturning a trial court's entry of summary judgment for defendants. Without discussing jurisdiction to review the denial of class certification, and with no necessary connection between certification and the issue decided on summary judgment, we remanded the case, inter alia, for reconsideration of the class certification issue. Id. at 960-61; see also id. at 964-65 (Scalia, J., concurring in part and dissenting in part) (reviewing denial of class certification but finding that denial was proper).
 
 
 41
 On the other hand, in an earlier case, we declined to entertain a conditional cross-appeal of a class certification order. McCarthy v. Kleindienst, 562 F.2d 1269, 1276 (D.C.Cir.1977). In McCarthy, appellants had challenged the denial of a motion to intervene as well as the denial of class certification. After vacating the district court's denial of the motion to intervene, we held the "appeal of the denial of class certification [to be] essentially interlocutory with respect to [appellants'] continued participation in the lawsuit. We therefore find it inappropriate for decision at this time." 562 F.2d at 1276. Cf. Gray Panthers v. Schweiker, 716 F.2d 23, 39 (D.C.Cir.1983) (refraining from deciding whether prior failure to cross-appeal class certification issue deprived district court of power under Rule 23(c)(1) to redefine the class on remand).
 
 
 42
 While the district court in the instant case had denied a preliminary injunction in 1979, it had also certified the class and entered a final judgment in favor of the defendant. See De Medina, 686 F.2d at 1001. Class certification was thus not necessarily bound up with the 1982 appeal which focused on the trial court's dismissal on the merits of plaintiffs' prima facie case. After we reversed the trial court and remanded the case, class certification, once again, became subject to modification by the trial court during proceedings on remand. Therefore, one cannot confidently say whether, upon reversing the trial court's merits dismissal in 1982, we would have entertained a conditional cross-appeal of the class certification order at that time. While the Ninth Circuit would have counseled against such a review, the Seventh Circuit apparently would have considered the appeal. Following our precedents of Wagner and Fink, we would have examined the class certification decision, whereas McCarthy would have permitted us to decline the invitation.
 
 
 43
 Prescience would, of course, have commanded a course that cleared the channels to avoid running aground on this issue over a decade later. The traditional values militating against piecemeal appeals would not have been served by declining to review the class certification back at the beginning. Nonetheless, we could and might have concluded that the class certification question had reverted to interlocutory status with the reversal of the trial court's decision and the reinstatement of the hiring discrimination claim. Given such uncertainties, it would ultimately be unfair to rest our decision on a waiver theory based on defendant's failure to bring a conditional cross-appeal of the class certification question in the first appeal twelve years ago.
 
 
 44
 Appellees' second waiver argument is based upon a "Memorandum to the Court" filed by the USIA after the 1982 reversal in which the Agency conceded:Ms. Medina, as an original named plaintiff and intervenor, was a proper representative of the class at the time of certification. The class claims of discrimination in hiring and retaliation have already been tried. The interests of the unnamed class members remain alive even though Ms. Medina's claim has become moot. Like the class representatives in Sosna [v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) ] and Franks [v. Bowman Transportation Co., 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976) ], she has "simply 'left' the class, but the class remain[s] substantially unaltered.... [Her] mootness [is] not related to any factor also affecting the unnamed members of the class." Kremens v. Bartley, [431 U.S. 119, 132, 97 S.Ct. 1709, 1717, 52 L.Ed.2d 184 (1977) ]. Claims of the class may, therefore, properly be considered in remand proceedings before this [c]ourt.
 
 
 45
 Memorandum to the Court (Nov. 24, 1982), reprinted in J.A. at 71, 72-73. Notably this letter was filed over five months after the Supreme Court's decision in General Telephone Co. v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), upon which the USIA now principally relies and nearly three months after this court's decision on appeal reversing the nonliability findings as to hiring claims. The Agency characterizes this memorandum as merely an explanation of why the dismissal of Ms. Medina's individual claim was not harmful to the class without expressing any concession as to the validity of the class certification itself. Indeed, the memorandum is ambiguous enough with regard to the USIA's position on the propriety of the class certification itself so as not to constitute a waiver of its earlier stated objection to the certification. Finding no waiver, we turn to the merits of the class certification challenge.
 
 C. Class Certification
 
 46
 Rule 23 of the Federal Rules of Civil Procedure provides that a court may only entertain a class action if:
 
 
 47
 (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 
 
 48
 FED.R.CIV.P. 23(a). In addition to satisfying subsection (a) of Rule 23, a plaintiff must also demonstrate that one of the conditions under subsection (b) is met. The relevant criterion in subsection (b) for our purposes is that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED.R.CIV.P. 23(b)(2). Finally, subsection (c) provides that "[a]s soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits." FED.R.CIV.P. 23(c)(1).
 
 
 49
 When the EEOC seeks classwide relief under Title VII on behalf of individuals discriminated against by a private employer, the conditions of Rule 23 need not be met in order to maintain the suit as a class action. General Tel. Co. v. EEOC, 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). However, Title VII does not similarly exempt non-EEOC plaintiffs from the strictures of Rule 23. Id. at 330, 100 S.Ct. at 1706; East Texas Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 405, 97 S.Ct. 1891, 1897, 52 L.Ed.2d 453 (1977).
 
 
 50
 1. The Former "Across-the-Board" Approach to Certification
 
 
 51
 Beginning with the Fifth Circuit's decision in Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122, 1124 (5th Cir.1969), many courts permitted a plaintiff to launch an "across-the-board attack" on an employer's entire range of employment decisions. Such a challenge permitted a plaintiff who suffered discrimination as the result of one kind of employment decision (e.g., hiring) to be the class representative as well for employees who were harmed by another kind of employment decision (e.g., promotion). In these early cases, a court would certify an across-the-board class based solely on a complaint alleging group discrimination. Such an allegation alone was presumed sufficient to satisfy the commonality and typicality requirements for class certification under Rule 23. No additional particularized showing that the employer indeed followed a broad policy of discrimination across different employment decisions was deemed necessary. The underlying theory of this broad-based approach to class certification was that despite the "different factual questions with regard to different employees ... the 'Damoclean threat of a racially discriminatory policy hangs over the racial class [and] is a question of fact common to all members of the class.' " Id. at 1124 (quoting Hall v. Werthan Bag Corp., 251 F.Supp. 184, 186 (M.D.Tenn.1966)). See, e.g., Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239 (3d Cir.1975), cert. denied, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); Long v. Sapp, 502 F.2d 34, 43 (5th Cir.1974); Gay v. Waiters' and Dairy Lunchmen's Union, 549 F.2d 1330 (9th Cir.1977); Rich v. Martin Marietta Corp., 522 F.2d 333, 340 (10th Cir.1975). See generally Wagner, 836 F.2d at 588-89 (discussing rise and fall of across-the-board challenges); Council of & for the Blind, Inc. v. Regan, 709 F.2d 1521, 1546-47 & nn. 61-62 (D.C.Cir.1983) (en banc) (Robinson, C.J., concurring in part and dissenting in part) (same); Griffin v. Dugger, 823 F.2d 1476, 1484-87 (11th Cir.1987), cert. denied, 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 193 (1988) (same).
 
 2. East Texas Motor Freight and Falcon
 
 52
 While the Supreme Court has reaffirmed the principle that suits alleging discrimination on the basis of race, gender, or national origin "are often by their very nature class suits," it effectively repudiated the earlier line of appellate court cases that would automatically certify an across-the-board class based solely upon a complaint alleging group discrimination. East Texas Motor Freight, 431 U.S. at 405, 97 S.Ct. at 1897. See also General Tel. Co. v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). In these two cases, the Supreme Court established that class certification under Rule 23--even in Title VII group discrimination cases--could only be granted after a rigorous analysis of whether adjudication of the named plaintiffs' claims and those of the class would indeed share common issues of fact or law.
 
 
 53
 In East Texas Motor Freight, the Supreme Court reversed a court of appeals for certifying a class despite the fact that "it was evident by the time the case reached that court that the named plaintiffs were not proper class representatives." 431 U.S. at 403, 97 S.Ct. at 1896. The court of appeals had not disturbed the trial court's finding that the named plaintiffs were not qualified for the positions that they were allegedly denied on the basis of their race or national origin. Nonetheless, the court of appeals had reasoned that " 'the requirements of Rule 23(a) must be read liberally in the context of suits brought under Title VII' " and certified the class on appeal. Id. at 401, 97 S.Ct. at 1895 (quoting court of appeals). The Supreme Court reversed. While not fatal to the existence of a class that during trial its named representatives turn out not to be members of the class, id. at 406 n. 12, 97 S.Ct. at 1898, as an initial matter, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members," id. at 403, 97 S.Ct. at 1896 (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 216, 94 S.Ct. 2925, 2929, 41 L.Ed.2d 706 (1974)) (citations omitted).
 
 
 54
 In Falcon, the Supreme Court further held that a plaintiff who had suffered promotion discrimination could not be presumed to qualify as a class representative for persons of similar national origin aggrieved by the employer's discriminatory hiring practices:
 
 
 55
 Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a promotion on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination, and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims.
 
 
 56
 457 U.S. at 157, 102 S.Ct. at 2370 (footnote omitted). While this gap could be bridged by a specific showing that the employer's hiring and promotion practices shared a common policy of discrimination, the complaint in Falcon "contained no factual allegations concerning petitioner's hiring practices." Id. at 150, 102 S.Ct. at 2367. The Court held that the named plaintiff's complaint provided an insufficient basis to conclude that commonality would exist between the adjudication of his promotion discrimination claim and class members' hiring discrimination claim. Therefore, the district court had erred when it certified the class solely on the basis of the allegations in the complaint without holding an evidentiary hearing.
 
 3. The Case at Bar
 
 57
 a. Initial class certification
 
 
 58
 Under current law, the trial court's initial class certification may well have exceeded the scope permitted by the pleadings. See De Medina, 686 F.2d at 1013 n. 11 ("recent Supreme Court precedent suggests that the class certified here may have been overbroad" (citing General Tel. Co., 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740)). When in February of 1978 Ms. Hartman moved for class certification, she alleged that there were over 3,000 women currently employed at the USIA and that the number of job applicants presumably well exceeded this figure. She further alleged that defendant engaged in a "pattern of sex discrimination" which (1) invariably presented "common questions of law and fact with respect to [d]efendant's conduct affecting the class," and (2) ensured that her claim was "typical of the class." J.A. at 24-28. Finally, the plaintiff alleged that she had competent counsel to represent the class and that her interests were not in conflict with those of the class. Id. at 28-29. Thus, apart from the specific factual allegations contained in the original complaint (regarding the USIA's failure to hire Ms. Hartman), the motion for class certification was largely conclusory in nature.
 
 
 59
 The USIA filed a memorandum in opposition to class certification, arguing, inter alia, that the class was imprecise, too large, and that ultimately plaintiff represented only herself. J.A. at 37. In particular, the Agency maintained that the plaintiff had not presented allegations warranting an "across-the-board" challenge to the entire range of defendant's employment practices, i.e., a challenge to defendant's promotion as well as hiring decisions. It further claimed that certification was improper because the class included applicants for foreign service as well as civil service positions. The USIA argued that the two personnel systems "employ[ ] different procedures for considering and selecting applicants," and therefore, the Agency maintained, petitioner could not claim that her experience as an unsuccessful applicant for a civil service position was typical of all members in the class. J.A. at 43.
 
 
 60
 The USIA's opposition notwithstanding, the district court in April, 1978, conditionally certified the class of "all women who have applied for employment with or are currently employed by the [USIA] and who have been or continue to be adversely affected by the [USIA's] discriminatory employment practices," with the following proviso:
 
 
 61
 Although plaintiff's complaint does not state the policies or patterns of discrimination affecting the class with the specificity the [c]ourt would prefer, the [c]ourt will conditionally certify the class at this time. However, the [c]ourt would like to caution the plaintiff that this certification is "conditional" and may be modified by the [c]ourt at any time should the record later indicate such to be appropriate.
 
 
 62
 J.A. at 48. The court later modified the class to exclude all clerical employees and dismissed the class retaliation and class promotion claims. Hartman v. Wick, 600 F.Supp. 361; De Medina, 21 Fair Empl.Prac.Cas. (BNA) at 81. None of these subsequent rulings is challenged on appeal, and we are no longer faced with the kind of across-the-board class that underlay the Supreme Court's decision in Falcon. We hasten to add that the plaintiff nonetheless is not absolved of the duty to demonstrate the requisite commonality and typicality in order to maintain the suit as a class action. The question, then, is whether the trial court erred in certifying the class of all women who applied for employment at the USIA and were adversely affected by the Agency's discriminatory hiring practices.
 
 
 63
 b. Certification of class for hiring discrimination claim
 
 
 64
 (1) Standard of review
 
 
 65
 A district court exercises broad discretion in deciding whether to permit a case to proceed as a class action. Bermudez v. United States Dep't of Agric., 490 F.2d 718, 725 (D.C.Cir.), cert. denied, 414 U.S. 1104, 94 S.Ct. 737, 38 L.Ed.2d 559 (1973). In light of the fact that trial courts have the primary responsibility of ensuring the "orderly management of litigation" and that the purpose of class actions lies in "advanc[ing] the efficiency and economy of multi-party litigation," trial courts "are uniquely well situated to make class certification decisions." McCarthy v. Kleindienst, 741 F.2d 1406, 1410 (D.C.Cir.1984) (citations omitted). As a result, we review a class certification decision conservatively only to ensure against abuse of discretion or erroneous application of legal criteria. Wagner, 836 F.2d at 586.
 
 
 66
 (2) Merits of certification
 
 
 67
 The principal problem in the certification here is that it encompasses both civil service and foreign service applicants to the USIA, despite the fact that the two categories are hired under different personnel systems. Foreign service officers do not directly apply to the USIA, but must pass a general foreign service entry examination instead. Upon successful completion of this examination, foreign service applicants must further undergo an oral assessment of their qualifications. Neither of these steps, of course, is required of civil service applicants.
 
 
 68
 (a) Representation across jobs generally
 
 
 69
 Normally, an employee who was not aggrieved by a particular test or hiring requirement lacks standing to challenge that test or requirement. Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1409 (D.C.Cir.), clarified on reh'g, 852 F.2d 619 (1988), cert. denied, 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1018 (1989); Payne v. Travenol Laboratories, Inc., 565 F.2d 895, 898 (5th Cir.), cert. denied, 439 U.S. 835, 99 S.Ct. 118, 58 L.Ed.2d 131 (1978). Accordingly, the Eleventh Circuit, for example, held that an incumbent plaintiff "complaining of a subjective decisionmaking process, could not represent [applicants] ... who may have been victims of a discriminatory objective decisionmaking process." Griffin v. Dugger, 823 F.2d 1476, 1490-91 (11th Cir.1987), cert. denied, 486 U.S. 1005, 108 S.Ct. 1729, 100 L.Ed.2d 193 (1988). But here, in contrast, plaintiffs did not challenge the foreign service entrance examination itself. Instead, they alleged that the USIA's hiring decisions made under either the civil service or foreign service personnel system intentionally discriminated against women.
 
 
 70
 The Supreme Court indicated in Falcon that "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably could justify a class of both applicants and employees if the discrimination manifested itself in hiring and promotion in the same general fashion, such as through entirely subjective decisionmaking processes." Falcon, 457 U.S. at 159 n. 15, 102 S.Ct. at 2371. See Carpenter v. Stephen F. Austin State Univ., 706 F.2d 608, 617 (5th Cir.1983); Griffin, 823 F.2d at 1487; Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1557-58 (11th Cir.), cert. denied, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986). Similarly, given sufficient proof, an unsuccessful applicant for one particular job can presumably challenge discriminatory hiring for different job categories where the primary practices used to discriminate in the different categories are themselves similar. While it may be prudent to have the class divided into sub-classes represented by a named plaintiff from each of the differing job categories, it would not be necessary to the validity of the class certification to do so. Contrary to appellant's assertion, the Supreme Court in East Texas Motor Freight did not propound a requirement of precise "congruence" between the job categories of named plaintiffs and those of the putative class. East Texas Motor Freight only held that certification was unwarranted when at the time of certification it was abundantly clear that plaintiffs were not members of the class. See Cook v. Boorstin, 763 F.2d 1462, 1471 (D.C.Cir.1985); Carpenter, 706 F.2d at 617.
 
 
 71
 In other words, we are unwilling to hold as a matter of law, that a named plaintiff who unsuccessfully applied for one job can never represent an employee who unsuccessfully applied for another job simply because the application process for the second job included a separate and different element. Indeed such a restriction would permit an employer to defeat the broad enforcement of Title VII simply by administering different objective tests as part of the application process for each job. See Cook, 763 F.2d at 1469 ("the plethora of job categories at the higher levels of the federal bureaucracy and in many other white collar organizations suggests that adopting [the agency]'s approach to proof of discrimination [which would have limited each proof of discrimination to evidence regarding only one job category] could well preclude the effective use of statistics in combatting race discrimination in many if not most areas of high-level employment"). Thus, where a plaintiff charges that subjective employment decisions have allowed the employer systematically to discriminate on the basis of gender in choosing among the minimally qualified applicants, the potential for common issues of law and fact among applicants for different positions clearly exists regardless of individual differences in job descriptions or minimal qualifications. See also Larkin v. Pullman-Standard Div., Pullman, Inc., 854 F.2d 1549, 1572-73 (11th Cir.1988) (commonality does not require identity of every factual and legal issue raised by the named plaintiff and the class members), vacated on other grounds, 493 U.S. 929, 110 S.Ct. 316, 107 L.Ed.2d 307 (1989). The fact that the named plaintiffs do not possess the necessary qualifications for the foreign service positions at the USIA, e.g., completion of the foreign service entry examination, or that the USIA's hiring of foreign service officers differs in some respects from hiring of civil service officers, does not in itself preclude the named plaintiffs from representing the entire class.
 
 
 72
 (b) The class cutting across jobs here
 
 
 73
 At the same time, however, we are unable to locate in the record sufficient positive findings of commonality and typicality as to the types of discriminatory practices utilized in hiring both groups to permit affirming the trial court's original class certification encompassing both civil service and foreign service applicants. Put simply, the record does not adequately demonstrate either that a class exists or that the named plaintiffs are the proper representatives of that class. While plaintiffs' statistics may have demonstrated that discrimination against women applicants to the six USIA job categories was afoot, nothing in the record so far permits the additional inference that class members suffered a common injury.
 
 
 74
 As Falcon made clear, there is more to a showing of commonality than a demonstration that class plaintiffs suffered discrimination on the basis of membership in a particular group. The trial court in Falcon had determined that the employer's hiring decisions had discriminated against members of the named plaintiff's national origin. 457 U.S. at 159, 102 S.Ct. at 2371. That fact alone did not suffice to satisfy the commonality and typicality requirements of Rule 23. "What the Court demands from those seeking certification of a class cutting across employment status [e.g., applicants and incumbents] or job categories is a 'specific presentation' identifying the questions of law or fact common to the class representative and the members of the class proposed." Wagner, 836 F.2d at 589 (footnote omitted). While in a case alleging intentional discrimination, such as this one, a plaintiff need not isolate the particular practice and prove that such practice caused the discrimination, plaintiffs must make a significant showing to permit the court to infer that members of the class suffered from a common policy of discrimination that pervaded all of the employer's challenged employment decisions.
 
 
 75
 In a motion for class certification, the plaintiff bears the "obligat[ion] to show, in at least a preliminary fashion, the required commonality between her claims and those of the putative class." Nelson v. United States Steel Corp., 709 F.2d 675, 680 (11th Cir.1983) (citations omitted). Ms. Hartman's complaint and motions for class certification, however, evince a complete absence of factual allegations regarding the commonality or typicality requirements of Rule 23. This failure is compounded by the fact that prior to entry of the conditional class certification, the trial court apparently did not conduct any evidentiary hearing or other factual determination that would qualify as a rigorous analysis of whether the prerequisites for a class action had been met.
 
 
 76
 (c) The inclusion of foreign service officers in the class
 
 
 77
 The lack of a specific foundation for treating women applicants to USIA as a class a fortiori undermines the further effort to branch out and include foreign service officers in the plaintiff class. Challenging in particular the existence of commonality between the civil service and foreign service components of the current class, defendant seeks to introduce new statistics demonstrating that when broken down between the two categories, hiring figures do not even bear out a prima facie claim of hiring discrimination for the foreign service portion of the class. Brief for Appellants at 34. Whether to consider new evidence after the close of the liability portion of a bifurcated trial is a decision initially to be made by the district court. The trial court's refusal to reconsider its liability determination based upon such newly-minted statistics is reviewed under the abuse-of-discretion standard. See Segar v. Smith, 738 F.2d 1249, 1285 (D.C.Cir.1984); Trout v. Lehman, 702 F.2d 1094, 1106 (D.C.Cir.1983), vacated on other grounds, 465 U.S. 1056, 104 S.Ct. 1404, 79 L.Ed.2d 732 (1984). That having been said, we are still unable, on appeal, to find sufficient support in the old trial statistics alone to uphold class certification.
 
 
 78
 In the course of the liability trial, the district court on the basis of employment data that did not differentiate between civil service and foreign service officers determined that the Agency did discriminate against women job applicants for six job categories. This determination assumes, and therefore cannot in itself suffice to establish, commonality and typicality among women civil service and foreign service applicants for any given position at the USIA. Moreover, since the district court did not make any findings at the time of class certification, and its 1984 liability judgment was based solely on an unrebutted prima facie case made out by statistics, there is no other trial evidence to which we might turn.[4] While statistics can generally be probative of the question of commonality, we would feel uncomfortable in resting on the trial statistics in the present record for a final determination of commonality. Cf. Carpenter, 706 F.2d at 617 ("The statistical proof of channeling ... and the anecdotal testimony of female ... employees presented at trial set forth common issues of law and fact"); Cook, 763 F.2d at 1472 ("Plaintiffs in this case appear to have met the [commonality and typicality] requirement amply by presenting affidavits and memoranda suggesting that the [employer]'s subjective standards for advancement have resulted in systematic discrimination against blacks and other minorities."); Griffin v. Carlin, 755 F.2d 1516, 1532 (11th Cir.1985) ("22 named plaintiffs had alleged sufficiently diverse employment practices that the court might infer that discriminatory treatment was typical of defendant's promotion practices and that defendant's promotion practices were motivated by a pervasive policy of racial discrimination"); Bishop v. New York City Department of Housing Preservation and Development, 141 F.R.D. 229 (S.D.N.Y.1992) (finding that statistical and anecdotal evidence supported commonality claim); see generally 2 EMPLOYMENT DISCRIMINATION LAW Secs. 2402-10 (LAWYERS COOPERATIVE PUB. 1993).
 
 
 79
 We emphasize that there is no requirement in this circuit that a trial court conduct an evidentiary hearing or make specific factual findings on the issue of class certification in every case. But in this instance the paucity of the record on the question of appropriate class certification effectively precludes us from performing our reviewing task. Compare Berger, 843 F.2d at 1409 ("[W]e find the [d]istrict [c]ourt's failure to articulate the reasons for its decisions [to certify the class] an insufficient reason to remand.") and Postow v. OBA Fed. Savings & Loan Ass'n, 627 F.2d 1370, 1380-81 n. 24 (D.C.Cir.1980) (finding no abuse of discretion in certifying class where district court did not hold hearings) with Fink v. National Savings and Trust Co., 772 F.2d 951, 960-61 (D.C.Cir.1985) (remanding in part because absence of specific findings made review of class certification decision impossible).
 
 D. Remand
 
 80
 Relying on this court's decision in Berger, and the Seventh Circuit's decision in Ekanem v. Health and Hospital Corp., 724 F.2d 563, 573 (7th Cir.1983) (as modified 1984), cert. denied, 469 U.S. 821, 105 S.Ct. 93, 83 L.Ed.2d 40 (1984), the USIA argues that the appropriate remedy in this case is decertification and dismissal of the judgment against the Agency. Berger, however, only indicates that a named plaintiff cannot bring a class action challenge to a specific hiring requirement that did not cause the plaintiff any injury within the applicable statutory time limit. 843 F.2d at 1409-11. Similarly, Ekanem held that because none of the named plaintiffs had filed the necessary EEOC charges relating to the class claims that survived a trial on the merits, decertification of the class with respect to the surviving class claims was the proper disposition. 724 F.2d at 573. As discussed above, here the named plaintiffs claim that they suffered an injury by virtue of a discriminatory hiring policy that pervaded the USIA's decisions to hire its civil service and foreign service officers. In other words, if the same hiring practice operated to discriminate against women applicants throughout the civil service and foreign service personnel systems, then the named plaintiffs are indeed proper class representatives for civil service and foreign service applicants alike.
 
 
 81
 The question ultimately is whether members of the plaintiff class--whether foreign service or civil service applicants--share a common injury. While prior to the Supreme Court's Falcon decision, the issue of class certification may have come to rest with the simple allegation of gender discrimination, since the Falcon decision, a court must conduct a more rigorous inquiry into commonality and typicality. We find no evidence of such a directed inquiry in this record nor can we locate evidence in the record that would make such an inquiry unnecessary at this late date.[5]
 
 
 82
 Of course the district court should consider first whether class certification back in 1978 was proper. However, even if class certification in 1978 was premature, it may nonetheless be proper now. The district court would have to ask whether the evidence currently supporting class certification could only have been developed as a result of the initial (improper) decision to certify the class. Evidence that could not have entered the district court's ken except as a result of class certification should presumably not factor into an ex post decision of whether class certification was proper. Since appellant's principal challenge is that the trial statistics which led to the liability decision are premised on the (improper) class certification, and since we do not expect the district court to rely solely on the trial statistics in its reevaluation of the propriety of class certification, we would not expect that premature class certification would have undermined any other evidence which might support class certification now. The district court, however, will have ample opportunity to consider this issue on remand. The district court may also consider creating sub-classes, certifying a narrower class, or adding additional class representatives. See Fink, 772 F.2d at 960-61; Holsey v. Armour & Co., 743 F.2d 199, 205 (4th Cir.1984), cert. denied, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985) (permitting intervention after trial and before entry of judgment); Carpenter, 706 F.2d at 617; Satterwhite v. Greenville, 634 F.2d 231 (5th Cir.1981) (in banc).
 
 
 83
 Although reluctant to dictate another chapter in this epic litigation, we can discern no principled course other than to remand this case to the trial court to reconsider the question of class certification, and to follow that determination with whatever is necessary to conclude the proceeding.
 
 
 84
 Remanded.
 
 
 85
 RANDOLPH, Circuit Judge, concurring, in which Circuit Judge HENDERSON joins:
 
 
 86
 On remand, the district court conscientiously reconsidered its 1978 conditional certification of the class and, after briefly describing General Telephone Co. of the Southwest v. Falcon, 457 U.S. 147, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), decided to adhere to its earlier decision, although the court recognized that under Rule 23(c), Fed.R.Civ.P., it "could even now deny certification." Hartman v. Wick, 600 F.Supp. 361, 367 n. 2 (D.D.C.1984). The Agency quite obviously could not have challenged, in the 1982 appeal, this 1984 ruling. The Agency's failure to take a cross-appeal therefore could not have waived its objections to the ruling. The current appeal is the Agency's first and only chance for appellate review of the district court's decision to maintain its original class certification despite Falcon. For that reason alone the certification issue is before us.
 
 
 87
 I agree with the balance of the court's opinion and therefore respectfully concur.
 
 
 
 *
 Judge Randolph's opinion represents the reasoning of a majority of the panel as to the issue discussed in Part II-B
 
 
 [1]
 Pursuant to Rule 43(c)(1) of the Federal Rules of Appellate Procedure, "[w]hen a public officer is a party to an appeal or other proceeding in the court of appeals in an official capacity and during its pendency ... ceases to hold office, ... the public officer's successor is automatically substituted as a party." Since commencement of this suit in 1977 the helm of the United States Information Agency has been passed from John E. Reinhardt to Charles Z. Wick to Bruce S. Gelb to Henry E. Cato and, finally, to Joseph Duffey who is the named defendant in this action
 
 
 [2]
 At each Teamsters hearing the plaintiff must show by the preponderance of the evidence that she applied for a job in one of the categories during the liability period and was rejected. She is then entitled to a presumption that the employer discriminated against her on the basis of her gender. The employer is then given an opportunity to overcome that presumption by demonstrating that he had a legitimate, nondiscriminatory reason for rejecting the applicant. If the defendant meets this burden, the claimant is allowed to offer further evidence demonstrating that the employer's proffered reason is merely a pretext for unlawful discrimination. See Hartman v. Wick, 678 F.Supp. at 335
 
 
 **
 Part II-B. represents the opinion of Judge Wald. Judge Randolph's concurring opinion represents the panel majority's reasoning on this issue
 
 
 [3]
 One need not endorse the additional implication in the quoted passage that as a result of the litigant's failure to cross-appeal, the court of appeals "could not have" granted the challenge on rehearing. 916 F.2d at 456 (emphasis added). Indeed, the Bethea opinion itself appears to repudiate that implication. Cf. id. at 455 n.6. Nonetheless the failure to cross-appeal--no less than the failure to raise issues on direct appeal--creates "law of the case" that generally binds subsequent proceedings. Id
 
 
 [4]
 The district court's only explicit discussion of the difference between civil service and foreign service personnel systems to be found is in the 1988 remedial order and is not directed to the issue of class certification. See Hartman, 678 F.Supp. at 321-22
 
 
 [5]
 The conditional nature of the original class certification appears to be immaterial to the current challenge that certification was improper. The court has treated the class as certified since that first order and has modified the class since the original certification order. Accordingly, our inquiry focused on whether the class as currently certified can be upheld on appeal